UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------X
                                        :
In Re:                                  :  05-60006
                                        :
    REFCO, LLC,                         :
                                        :
            Debtor.                     :
----------------------------------------X
                                        :
AXIS REINSURANCE COMPANY,               :  07-1712
                                        :
            Plaintiff,                  :
                                        :
            v.                          :  One Bowling Green
                                        :  New York, New York
BENNETT, et al.,                        :
                                        :  August 30, 2007
            Defendants.                 :
----------------------------------------X
```

TRANSCRIPT OF HEARING ON MOTIONS
BEFORE THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Klejna/Murphy:        MATTHEW R. GOLDMAN, ESQ.
                          HELEN B. KIM, ESQ.
                          Baker & Hostetler LLP
                          3200 National City Center
                          1900 East 9th Street
                          Cleveland, Ohio  44114-3485

For Director Defendants:  MICHAEL F. WALSH, ESQ.
                          SCOTT E. COHEN, ESQ.
                          Weil, Gotshal & Manges LLP
                          767 Fifth Avenue
                          New York, New York  10153-0119

For Axis Reinsurance:     JOAN M. GILBRIDE, ESQ.
                          WAYNE BORGEEST, ESQ.
                          ROBERT A. BENJAMIN, ESQ.
                          Kaufman, Borgeest & Ryan LLP
                          200 Summit Lane Drive
                          Valhalla, New York 10595


                          (Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:


For Defendants Schoen,        PAUL FERRILLO, ESQ.
  Jaekel Lee, Harkins,        Weil, Gotshal & Manges LLP
  Brightman, O'Kelly          767 Fifth Avenue
  and Gantscher:              New York, New York  10153-0119


For Phillip Silverman:        RICHARD CASHMAN, ESQ.
                              Times Square Tower
                              7 Times Square
                              New York, New York  10036-6524


For Tone Grant:               NORMAN L. EISEN, ESQ.
                              Zuckerman Spaeder LLP
                              1800 M Street NW, Suite 1000
                              Washington, D.C.  20036-5802


For Phillip Bennett:          DEBORAH ADLER, ESQ.
                              Golenbock, Eiseman, Assor,
                                Bell & Peskoe LLP
                              457 Madison Avenue
                              New York, New York  10022


For Arch Insurance:           DANIEL STANDISH, ESQ.
                              Wiley Rein LLP
                              1776 K Street NW
                              Washington, D.C.  20006


For Robert Trosten:           RACHEL M. KORENBLAT, ESQ.
                              Morvillo, Abramowitz, Grand,
                                Jason, Anello & Bohren, PC
                              565 Fifth Avenue
                              New York, New York  10017


(Appearances continue on next page.)

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


APPEARANCES CONTINUED:



For Sexton and Sherer:     IVAN O. KLINE, ESQ.
                           Friedman & Wittenstein
                           600 Lexington Avenue
                           New York, New York  10022



Court Transcriber:         RUTH ANN HAGER
                           TypeWrite Word Processing Service
                           356 Eltingville Boulevard
                           Staten Island, New York 10312


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

4

1    (Proceedings began at 10:20 a.m.)

2                THE COURT:  Okay.  <u>Refco</u> and the <u>Axis Reinsurance</u>

3    matters.

4                    [Pause in the proceedings.]

5                MR. GOLDMAN:  Good morning, Your Honor.

6                THE COURT:  All right.  There are a number of

7    matters on that generally come under the heading of the <u>Axis</u>

8    <u>Reinsurance</u> matters.

9                Have the parties discussed any particular order

10   that they want to proceed in?

11               MR. GOLDMAN:  Good morning, Your Honor.  Matthew

12   Goldman, Baker & Hostetler.  I will be speaking on behalf of

13   what we have called the moving defendants, the parties seeking

14   a preliminary injunction for advancement of defense costs.

15               Yes, I have spoken with Joan Gilbride -- yeah.  I

16   have spoken with Joan Gilbride.  I believe at least insofar as

17   Axis and the other moving defendants are concerned, the

18   appropriate procedure would be that this Court first determine

19   whether or not Arch should be permitted to intervene so that we

20   can determine whether or not they would be heard.

21               THE COURT:  Right.  I agree with you.

22               MR. GOLDMAN:  Our suggestion --

23               THE COURT:  I'd go with that first.

24               MR. GOLDMAN:  Okay.  Thank you, Your Honor.  Then

25   our suggestion would be that we proceed with the motion to

5

1  advance defense costs, the motion to file by the motions to

2  dismiss or to stay. And insofar as the lift stay motions are

3  concerned, there is no objection to lifting the stay to the

4  extent that it is applicable to deal with the defense cost

5  issues. That's not in dispute at all. The only thing that is

6  potentially at issue in the lift stays in my supplemental

7  motion asking for permission to also enter into settlements.

8  We can put that at the end because nothing about the lift stay

9  interferes with this argument.

10         THE COURT: Okay. I appreciate that probably a

11  fair amount of thought went into that order of proceeding and

12  perhaps some tactical considerations, too, but it strikes me

13  given the lack of any opposition, except the limited amount to

14  the part of the lift stay motion that it ought to be be lifted

15  for all purposes, that I should hear the motion to dismiss

16  first and then deal with the issue of advancing defense costs,

17  particularly since the debtor doesn't seem to care about that

18  and it appears to be no dispute because they haven't taken any

19  position whatsoever on this and they've not opposed lifting the

20  stay.

21         MR. GOLDMAN: Your Honor, I didn't actually say

22  it's that material in that order.

23         THE COURT: Okay.

24         MR. GOLDMAN: So, yeah, if the Court wishes to do

25  dismissal first, that is fine with us, Your Honor.

6

1            THE COURT:  Okay.  That's fine.

2            MR. GOLDMAN:  All right.  So I think then that

3    means that we start with intervention?

4            THE COURT:  So I need to hear from Arch, then,

5    first.

6            MR. GOLDMAN:  Thank you, Your Honor.

7            MR. STANDISH:  Good morning, Your Honor.  Daniel

8    Standish of Wiley Rein on behalf of Arch Insurance Company.

9            Your Honor, we seek to intervene in this case for

10   the limited purpose of opposing the request for the advancement

11   of defense costs notwithstanding the existence of a coverage

12   defense that bars coverage for the claim in its entirety.

13           Arch is in the same tower of insurance as Axis.

14   Arch has the policy that is ten million dollars excess of 40

15   million dollars.  At this point, the underlying limits have

16   been depleting rapidly.  We understand that the burn rate at

17   this juncture is about two million dollars a month.

18           The demand is that the officer defendants in this

19   case have made that Axis pay for their defense fees and costs

20   on an as-incurred basis notwithstanding the existence of a

21   threshold defense.  That is an issue that will affect Arch, as

22   well, in two different ways.  One, it will affect the amount of

23   the policy limits that remain under the Arch layer, as well as

24   affect Arch's rights potentially as a precedential matter if and

25   when Arch's policy is reached, which at this point given the

7

1  burn rate at least the amounts incurred would certainly

2  implicate that level.  So for that reason, Arch has a very

3  strong interest of that particular issue.

4        Arch also feels strongly about intervening in this

5  case because as Your Honor may recall in June of 2006 Your

6  Honor gave leave for Arch to file its declaratory judgment

7  action in New York Supreme Court in order to obtain an

8  adjudication of the coverage issues.  Your Honor found that

9  Arch would be prejudiced if it were unable to do so.

10        Once we got before Justice Freedman, the officer

11  defendants who are now demanding that Axis advance defense fees

12  and costs argued to Justice Freedman that the Arch suit should

13  be dismissed without prejudice, because it was totally

14  speculative whether or not the erosion of the underlying layers

15  would ever occur and Arch's policy would be implicated.  And

16  even if it did implicate Arch's layer, Arch could simply stand

17  on its denial and refuse to pay, thus directly contrary to the

18  position that they've now taken before this court in demanding

19  advancement.

20        So for that reason, we feel that Arch's interest --

21        THE COURT:  That wasn't the only reason they

22  opposed it, right?

23        MR. STANDISH:  That was not the only reason.

24  That's correct, Your Honor.  There was also an argument that it

25  would overlap with the underlying facts at issue in the

8

1   criminal prosecution going forward.

2           But Justice Freedman specifically did not reach

3   the issue of whether or not the insurers could be obligated to

4   include advance defense fees and costs notwithstanding the

5   existence of a threshold coverage defense.

6           Arch has moved promptly to intervene, Your Honor.

7   We've briefed this contemporaneously.  We filed with our

8   intervention papers our opposition to the request for

9   advancement and we don't feel that any of the defendants would

10  be prejudiced by the intervention.  In fact, it would be far

11  more efficient to adjudicate this issue in the context of the

12  same proceeding than have it litigated again at some future

13  juncture against Arch in a separate pleading.

14          So for that reason, Your Honor, we submit that

15  permissive intervention is appropriate here and should be, Arch

16  should be permitted to be in for this purpose.

17          THE COURT:  But it's not necessarily the same

18  issue, is it?

19          MR. STANDISH:  With respect to the primary policy

20  language it is, Your Honor.  Both the Axis policy and the Arch

21  policy incorporate by reference the language on which the

22  officers are relying for the advancement of defense fees and

23  costs.  They're focusing in the primary policy in condition (d)

24  that says that the insurer shall advance the covered advanced

25  costs on an as-incurred basis.  The dispute over whether or not

9

1  the advancement of covered advanced costs is required when the

2  policy excludes the defense costs is the same issue as to both

3  Axis and Arch.

4          The only distinction is in the policy provisions

5  on which Arch and Axis are relying for the denial of coverage.

6  Arch has its own prior knowledge exclusion in its policy and

7  there is no dispute in that case that that exclusion exists and

8  that it applies.  There's a dispute in the Axis case over

9  whether or not the exclusion actually is in the policy.  Axis

10 obviously takes the position that it is, but that dispute

11 doesn't exist as to Arch.

12         But with respect to the primary policy language,

13 the question of whether advancement of "covered defense costs"

14 means you have to advance uncovered defense costs is precisely

15 the same.

16         THE COURT:  Okay.

17         MR. STANDISH:  Thank you, Your Honor.

18         MR. KLINE:  Good morning, Your Honor.  Ivan Kline

19 from Friedman & Wittenstein in New York.

20         We represent in this action two of the officer

21 defendants, William Sexton and Sherer, arguing against the

22 intervention on behalf of them as well as defendants Klejna,

23 Murphy and Silverman, who are the five sort of moving insureds

24 on the advancement motion.

25         And even assuming there is some common question of

1  law, this is clearly a case where the Court should exercise its

2  discretion to deny the motion.  This case is about coverage

3  under the Axis policy, not the Arch policy.  We've asserted a

4  counterclaim against Axis; under the Axis policy we have not.

5  They are not mentioned or in any way involved the Arch policies

6  and we've made an advancement motion solely as against Axis

7  because its policy is now the one that's up, so to speak.

8          We have no claims against Arch.  We haven't asked

9  for advancement against Arch.  Arch wants to litigate not just

10  advancement in the abstract.  It specifically says it wants to

11  intervene to litigate whether the Arch policy requires Arch to

12  advance defense costs, but nobody's made that request, so I

13  don't know against whom they're going to litigate that, because

14  we haven't made the motion.  So procedurally there is a flaw in

15  what they seek to do, because nobody is seeking relief against

16  Arch, so they can't really be heard on an issue of when their

17  policy requires advancement of defense costs.  In fact, they

18  rely very clearly on a specific provision of their policy,

19  which we have not briefed, we have not addressed because we

20  have no claims against them.

21          There's also a procedural flaw which their own

22  proposed opposition brief sets out and that they didn't address

23  in their reply when we pointed it out.  They state in their

24  proposed brief and in opposing advancement that in order for

25  there to be an advancement motion, there has to be an

11

1   underlying claim to support the request for relief, which

2   advancement would go with.  For example, the five moving

3   insureds have counterclaims against Axis and it's those

4   counterclaims with declaratory injunctive relief that support

5   our request for advancement.

6         Arch points that out because it says others aren't

7   really empowered to advancement anyway, but then it still seeks

8   to adjudicate advancement under its policy just by itself

9   without being hooked on in any way to any claim by or against

10  it.  And it's created its own procedural conundrum.  It

11  recognized it can't come in here to seek to intervene and

12  litigate coverage under the policy, because that would be

13  barred by Justice Freedman's order.  So instead they're seeking

14  just to litigate this advancement issue, but you can't really

15  litigate that in the abstract by itself without the "coverage"

16  under the policy also being in dispute.  They themselves state

17  that in their proposed opposition brief.

18        In terms of the other procedural flaw would be if

19  Your Honor granted that intervention, you know, then what?  We

20  haven't made a motion against Arch, so how can Your Honor

21  adjudicate whether advancement is required under the Arch

22  policy when we haven't briefed it, and we have no intention at

23  this point of briefing it, and may never have to brief it.

24        And in terms of judicial efficiency, some court is

25  going to have the coverage dispute against Arch unless it, you

1  know, goes away due to one cause or another.  It's not going to

2  be this court, because by their own statement they can't come in

3  here now to seek to adjudicate coverage.  So to have this court

4  somehow rule in the abstract on advancement under the Arch

5  policy simply makes no sense when some other court will have

6  the coverage issue.  And in both cases they're going to be

7  raising the prior knowledge exclusion in their policy as the

8  key provision to look at.

9          Now, clearly for purposes of efficiency, if we

10  ever want to seek advancement under the Arch policy, we'll have

11  to do something.  We'll have to do it in some court where

12  coverage is also at issue.  And in terms of what Arch's counsel

13  said we're already inconsistent positions, advancement was not

14  an issue before this.

15          THE COURT:  Oh, you don't have to get into that

16  one.

17          MR. KLINE:  All right.  I think that covers the

18  points I want to make, unless Your Honor has some further

19  questions.

20          THE COURT:  Okay.  Why isn't counsel right that, as

21  you said, the common issue here is coverage under the primary

22  policy and coverage was raised in state court so why isn't this

23  really an end run around the state court decision?

24          MR. KLINE:  There are different coverage issues.

25  This coverage issue is not reached by Justice Freedman.  At

1  pages 3 to 4 of the rule --

2          THE COURT:  But she said it was premature and this

3  shouldn't be happening now.

4          MR. KLINE:  She found that the litigation of the

5  application of the Arch exclusion was premature.  What Justice

6  Freedman did not reach was the question that is being presented

7  by the motion for preliminary injunction to be argued this

8  morning of whether or not under language of the primary policy

9  and applicable law an insurance company that has denied,

10 regardless of the basis, can't -- has to be obligated to advance

11 defense fees and costs notwithstanding the existence of that

12 coverage defense when the demand is made and has to instead

13 litigate issues of coverage all the way to a conclusion and

14 then try to recoup those amounts.

15          That limited question is the question on which

16 Arch seeks to intervene here, and that's the question that's

17 presented by the motion for preliminary judgment.  Regardless

18 of what the specific coverage defense is, the common issue is

19 whether or not given the language of the primary policy that

20 only requires the advancement of covered defense costs, the

21 Court should turn a blind eye to that language and enforce the

22 advancement of those defense fees and costs anyway until there's

23 some final adjudication in the coverage litigation.

24          THE COURT:  But I mean, you're using the same term,

25 "covered," "coverage."  It's the same term and it's the same

14

1    analysis, isn't it, that she went through?

2                MR. KLINE:  No, Your Honor.  The analysis --

3                THE COURT:  I mean, I understand that she had an

4    alternative basis for her ruling, so one of her bases -- we

5    went through this point on coverage.

6                MR. KLINE:  Your Honor, Justice Freedman did not

7    look at the advancement language in the policy.  In the Supreme

8    Court, the director defendants actually asked Justice Freedman

9    to enter an order for the advancement of defense fees and costs

10   until final adjudication of the coverage issue.  And in her

11   opinion she expressly did not reach that issue, so the specific

12   issue on which we seek to intervene in this matter were reached

13   by Justice Freedman.

14                THE COURT:  They're not asking for it here.

15                MR. KLINE:  They are, Your Honor, in their

16   preliminary injunction papers.

17                THE COURT:  Not from Arch.

18                MR. KLINE:  They are asking it from Axis and it

19   will be the same issue under the primary policy language

20   because both Arch and Axis incorporate by reference conditions

21   D-2 and D-3, which are at issue in this case.

22                Because of that overlap Arch has an interest in

23   the income.  I have no doubt that depending on the outcome here

24   one side or the other will be able to tout that, if and when

25   the Arch layer is ever reached.  And, given the burn rate on

1    defense expenses and the demands for settlement that are now

2    being bandied about, I have no doubt that the existence of

3    coverage under the Arch policy will be squarely at issue in the

4    very near future based on the communications that we're

5    receiving.  And at that point, we're going to have to deal with

6    this issue.  It's much more efficient to deal with the issue in

7    one proceeding when that same language is at issue on that

8    issue.

9            THE COURT:  Even though you have different

10   language in your own policy from --

11           MR. KLINE:  The exclusionary language differs.

12   That's correct, Your Honor.

13           THE COURT:  Okay.

14           MR. STANDISH:  Your Honor, I just want to

15   reiterate.  Their motion very clearly says they seek to

16   intervene to litigate the issue whether the Arch policy

17   requires Arch to advance defense costs.  They're not coming in

18   seeking to just talk about whether in general we can get

19   advancement or whether under the Axis policy we're entitled to

20   advancement and question whether they even have standing to do

21   that.

22           In that sense, they're like any insurer that may be

23   out there that may have language similar to the primary policy

24   in any case.  You wouldn't allow that insurer to come and

25   intervene in this case.  And here, they've already been told by

16

1    Justice Freedman they really can't do what they're now seeking

2    to do.  And if you look at their proposed brief, it's full of

3    references that their policy, their prior knowledge to

4    exclusion: they're seeking to argue the applicability of that

5    exclusion albeit to try to avoid advancement as against them,

6    which has not been sought.

7              THE COURT:  Okay.  Arch Insurance Company has

8    moved for permission to intervene under Rule 24(b) incorporated

9    by Bankruptcy Rule 7024 in this declaratory judgment litigation

10   between a lower tier insurer, Axis Reinsurance Company and

11   various defendants, former directors and officers of Refco,

12   Inc.  The movant acknowledges that there's not a complete

13   overlap of the issues in the Axis Reinsurance litigation and

14   the litigation that it would want to pursue if it were

15   permitted to intervene, which would be to seek a declaratory

16   judgment that it -- that is, Arch -- would not be obligated

17   under the Arch policy to advance defense costs to the directors

18   and officer beneficiaries of Refco's insurance with it.  That is

19   because exclusions relied upon by Arch in its policy differ

20   from exclusions relied upon by Axis.

21              The common issue that Arch relies upon for

22   purposes of Rule 24(b) is language in the first-tier policy

23   pertaining to covered claims as they relate to defense costs,

24   among others -- or "losses," as defined in the policy -- which

25   is a link in the logical chain that if broken might prevent

1   Arch from pursuing certain of its arguments, if not all of

2   them, that it does not have to advance coverage.  No

3   beneficiary of the policy has actually apparently at this time

4   sought to compel Arch to advance coverage.  I would also note

5   that the debtor in this case has appeared to be completely

6   neutral on the issue and is not a party to this litigation and

7   has taken no position whatsoever.

8            It appears to me that to the extent that it is a

9   common issue of law (and fact to the extent there's any factual

10  issue) in interpreting the relevant insurance policies, it

11  would not be a proper exercise of my discretion to permit Arch

12  to intervene.  As is clear from the briefing on the motions

13  before the Court today in connection with the Axis Reinsurance

14  matter, first, the actual language of the policy is important.

15    Second, issues of ripeness or whether the Axis litigation is

16  premature are important and are to some extent fact driven, in

17  particular driven by the claimed exigencies faced by the policy

18  beneficiaries, the officers and officers who have felt the

19  pinch of not getting the coverage at that tier.

20           To my mind, it would therefore be inefficient to

21  include Arch in this litigation at this time, and it would

22  instead be efficient to pursue the issues that are truly before

23  the Court in this litigation: that is, the issues involving

24  Axis and the directors and officers' claims against Axis and not

25  use this litigation as a funnel to invite any prospective

18

1    insurer to join some sort of massive proceeding.

2            That's compounded by two other considerations.

3    First, I note that Arch pursued in New York State court

4    declaratory judgment litigation regarding the terms of its own

5    policy and "coverage" under that policy, and the state court

6    ruled that that litigation was premature.  It seems to me, in

7    large extent this is an end run around that ruling -- that,

8    i.e., Arch's request to intervene here would be an end run

9    around that ruling -- and at a minimum that if I permitted Arch

10   to intervene, we would be frequently interrupted in litigation

11   by considerations of whether what Arch is in particular seeking

12   at that particular moment (if I permitted it to intervene)

13   would be an end run around that order or whether the order

14   would be binding on it.

15           Finally, as I noted at the pretrial conference on

16   this matter, I continue to have some concern, given (a) that

17   Refco's plan is confirmed and effective and substantially

18   consummated and (b) that Refco, the debtor, has no

19   participation in this litigation at all, as to the extent of my

20   jurisdiction over it.  And in light of all the other factors

21   that I've already mentioned arguing that I should not exercise

22   my discretion to further expand this adversary proceeding to

23   involve other insurers, it seems to me that Arch's issues, if

24   they're to be brought at all, should be brought in another court

25   when they become ripe.

19

1        So I'm not sure which of these counsel here took

2   the lead on this matter, but certainly you could submit an

3   order consistent with my ruling denying the motion.

4        I would ask you just to send a -- well, you can

5   work it out among yourselves.  I'd just ask one of you to send a

6   copy to Arch's counsel.  You don't have to settle it on him, but

7   just send him a copy at the same time you're sending it to

8   chambers, or as a courtesy you may want to send it to him a day

9   before, so he can determine that it's consistent with my ruling.

10

11       MR. KLINE:  Okay.  No problem.

12       THE COURT:  Okay.  Okay.  All right.  So that

13   leads to the motion to dismiss.

14           [Pause in the proceedings.]

15       MR. WALSH:  Michael Walsh from Weil, Gotshal &

16   Manges on behalf of all of what we call the director

17   defendants.  That's Brightman, Ganter, Harkins, Jeakel, Lee,

18   O'Kelly and Schoen.  It seems like Your Honor is very familiar

19   with the background here, but I can just run through the

20   structure if that would be helpful.

21       THE COURT:  Okay.

22       MR. WALSH:  Refco arranged the known insurance in

23   the amount of 70 million dollars.  That consists of a primary

24   policy and five excess policies.  Axis provides a third tier in

25   that tower, that is, the second excess policy and all of the

1    excess policies follow the form of the primary policy, except

2    to the extent that they're explicitly different.  This means

3    that the excess insurers are actually bound by the terms of the

4    primary policy.  The language that's key to today's dispute both

5    in connection with the motion to dismiss and the motions to

6    compel advancement is the language in the primary policy that

7    requires the advancement of defense costs as they're incurred

8    and unless it is finally determined that such costs are not

9    covered.

10           We understand that this issue is now coming to a

11   head with respect to Axis because that the coverage or the

12   amount under the primary policy and the amount under the first

13   excess policy are almost used up, at least that's our

14   understanding.  So I know this states the obvious, but the only

15   reason we're here, Your Honor, is because Axis wants you to tell

16   them that they don't have to advance defense costs.  And the

17   rest of us, even though we've chosen different ways to oppose

18   that, are here because we want to make sure that they do pay.

19   Now, we recognize that Axis had two valid choices here.  The

20   first is to advance defense costs with a reservation of rights,

21   which is what we think is what the policy envisions, and the

22   second is seek a declaratory judgment that the costs are not

23   covered by the policy.

24           Now, U.S. Specialty, the insurer under the primary

25   policy, and Lexington, the insurer on the first excess chose --

21

1   ultimately chose option one, and they just they reserved their

2   rights, and Axis has chosen option two.

3          We recognize that seeking a declaratory judgment

4   of coverage can be perfectly appropriate.  And, for example, if

5   there were no underlying litigation claims or if the litigation

6   claims were -- did not overlap, we're not disputing the

7   procedure.  What we are disputing is when there's a substantial

8   overlap of the underlying facts, we believe the law is clear.

9   A declaratory judgment may not precede and has to defer to the

10  underlying litigation for a determination of those facts.  And

11  we believe this is pretty much the universal rule.  We don't

12  think the rule is different in Illinois than in New York.  I

13  think the rule is exactly the same.

14         And, Your Honor, there are at least two key

15  reasons for that rule.  The first is that there is a

16  significant risk that a determination -- an early determination

17  in the coverage action -- would be prejudicial in the

18  underlying actions either through collateral estoppel, the law

19  of the case, or even -- or for other issues.

20         The second reason is since if you're litigating the

21  same issues at the very least you're duplicating effort.  You're

22  running up even more defense costs, more expenses on the very

23  same things, and that seems to be counter to good sense and

24  issues of judicial economy.

25         So we filed our motion to dismiss and we believe

22

1    that what we're saying in the motion to dismiss is that because

2    the courts are clear, the courts are clear that when there is a

3    substantial overlap the coverage action must defer, that under

4    Rule 12(b)(6) Axis is not in a position to be able to prove

5    their case and therefore dismissal without prejudice is

6    appropriate.

7            Now, let me get to the core of the issue, which is

8    substantial overlap.  Here in Refco, on the one hand, we've got

9    the criminal and fraud actions.  And the factual issues

10   underpinning those actions all relate to whether Bennett and

11   others manipulated Refco's books and records.  All of the

12   alleged actions that relate to the manipulation appear in the

13   indictment and in the various securities complaints, and

14   interestingly enough, they're all explicitly referred to in

15   Axis's complaint.

16           On the other hand, we have the coverage action.

17   Now, Axis's characterization is that the factual issue is

18   whether Bennett failed to disclose potential claims based on

19   his alleged manipulation of the books and records.  But saying

20   it that way doesn't change the fact that the facts are really

21   the same.  Without the alleged manipulation, there's nothing

22   really to disclose.

23           Axis points to Illinois law, in particular the

24   Guidant [Ph.] case as determinative.  First of all, we strongly

25   disagree that Illinois law applies, and I can come back to

23

1  this, Your Honor, but the absence of a choice of law in the
2  contract means that under New York's choice of law rules look at
3  various factors, the most important of which is the location of
4  the insured risk.  And, given that Refco's principal place of
5  business was in New York, that's where the executive officers
6  did their business and all the allegations related to coverage
7  issues were about actions taken by certain executive officers,
8  it's hard to argue that New York was not the location of the
9  insured risk.  But even if New York law applied, we think that
10 the answer on substantial overlap would be the same and we're
11 going to focus on <u>Guidant</u>.

12         Now, before I do, though, I do want to make a
13 point that there are Illinois decisions on the issue of whether
14 advancement is appropriate during the pendency of a coverage
15 action where New York law and Illinois law appear to differ
16 markedly, and that is why we believe New York law is the law
17 that should apply here.  But for the substantial overlap, we
18 think the test is pretty much the same.

19         So in <u>Guidant</u>, what was going on?  In the
20 underlying actions, you have essentially a bunch of personal
21 injury claims that were couched in language of fraud.  And I'm
22 assuming that they were done that way because today's medical
23 dominated society if you're going to have something implanted in
24 your body, undoubtedly you're going to be signing a waiver, an
25 assumption of the risk.  And the only way around that is to

1  demonstrate that you are not told all of the appropriate facts.

2   So the underlying factual issue is the misrepresentation about

3  the safety of the medical device and the risk of the medical

4  device.

5            In the coverage action, however --

6            THE COURT:  Well, can I -- I'm sorry.  Go ahead.

7  Go ahead.

8            MR. WALSH:  in the coverage action, however, it's

9  not that the device was actually defective or unsafe, but that

10  complaints had been received by the company, that the company

11  knew about and didn't disclose, so that's why the Guidant case

12  made a distinction and we can -- they were saying that we can

13  make a determination.  The trial court can make a determination

14  that as a factual matter, yes, they received complaints or,

15  yes, they didn't receive complaints, and it's not really

16  dependent upon whether the device was defective or not.

17            So the distinction with our case is in Refco you

18  can't make that distinction.  Without one, you can't have the

19  other.  At the end of the day, Axis can't get up and explain to

20  you what was it that Bennett should have disclosed if in fact

21  he did not manipulate the books or he did not commit fraud.

22  What was there to disclose?

23            So as you noted earlier, Your Honor, although not

24  involving Axis, this is not the first time this issue came up.

25   Justice Freedman addressed this very issue in connection with

1    Arch's request for a determination on coverage.

2              The way I view it, Your Honor, this is a classic

3    problem of putting the cart before the horse.  You've got all

4    these -- this huge multi-district securities action that's all

5    coming together and you've got the criminal complaints, and then

6    you've got this coverage action.  And what I foresee is if this

7    coverage action really went forward on the issues and was going

8    to determine the issues of what Bennett did, what he thought,

9    et cetera, every plaintiff in the securities actions would have

10   to come into this court, and all the discovery about all the

11   facts would be taking place in this court.  And it just seems

12   completely backwards in my mind that the coverage dispute

13   becomes the litigation for all these issues rather than the

14   underlying actions.  I just don't think that can be right.

15             From a policy perspective, I have to ask myself

16   what, you know, what's the purpose of the D&O policy, and it's

17   to protect officers and directors against claims for

18   misconduct.  And in my view, it would completely defeat that

19   policy if the end result was that the insurer could do an end

20   run and avoid the defense costs and get a ruling that could be

21   used against the insured in the underlying actions.  That's not

22   what people will open all this insurance for.  That doesn't

23   provide any protection at all, so the answer here is, you know,

24   clearly Axis has an issue here.  They have to -- in our view,

25   they have to advance defense costs but they have the right to

26

1   get those costs back once there is a decision on coverage if,

2   in fact, it does go against the insureds.

3           On the part of the defendants, though, if they

4   don't get defense costs, they -- any insurance may very well be

5   a lower.  We think the courts have assessed those competing

6   risks and come down on this issue in favor of the insured.

7           So in this situation, we believe it's perfectly

8   appropriate that the insurer has to wait for the results of the

9   underlying action, and that's what you have today, and that's

10  our reason, Your Honor, for asking the Court to dismiss the

11  case.

12          THE COURT:  Okay.  So you take the view that I

13  don't need to look at the policy language itself and interpret

14  on the merits whether -- on a 12(b)(6) basis -- whether Axis is

15  right or not.  You just say it's premature?

16          MR. WALSH:  Your Honor, it is our expectation that

17  if this action was dismissed and especially if it was dismissed

18  with the determination that New York law applies that Axis

19  would go ahead and advance.  You know, they're a highly, highly

20  reputable company.  If, however, they stand up today and say

21  you know, no way we're advancing, then we'll have to go the next

22  step, but what we're asking for today is a dismissal.

23          THE COURT:  Okay.  Thank you.

24          MS. GILBRIDE:  Good morning, Your Honor.  Joan

25  Gilbride for Axis Reinsurance Company, Kaufman, Borgeest &

27

1  Ryan.

2          I'm a little confused after hearing oral argument

3  from the director defendants on their motion for dismissal.

4  Essentially, what they've sought from this court is a complete

5  dismissal of this action, but at the same time they appear to

6  be suggesting that they should get some sort of affirmative

7  relief in the form of advancement of defense costs.

8          THE COURT:  Not Mr. Walsh's clients.

9          MS. GILBRIDE:  It's just -- it's -- what they're

10  essentially seeking, though, Your Honor, is an inconsistent

11  result.

12          THE COURT:  But his clients haven't sought that.

13  They haven't sought any sort of affirmative relief.  They just

14  sought dismissal.

15          MS. GILBRIDE:  I just think it's important to note

16  that Axis's position has been, Axis's position for over a year,

17  is that there is no coverage for this matter under its policy.

18   They took this position over a year ago.  Axis is not going to

19  change that position if this action gets dismissed. In fact,

20  what the director defendants have said in their papers and I

21  think have suggested to Your Honor is if this action is

22  dismissed, they would have no alternative but to turn around

23  and seek relief under the policy in another forum.  And I think

24  that just demonstrates the inconsistency, which a dismissal of

25  this action would result in, particularly in light of the fact

28

1    that there are other defendants, other insureds who are seeking

2    affirmative relief from Your Honor.  In any event --

3            THE COURT:  But why would that be the case if the

4    other forum were, for example, the court handling the

5    underlying litigation?  Then all the discovery could be the

6    same, all the trials could be the same.  There wouldn't be two

7    courts with potentially conflicting rulings or conflicting

8    schedules, and particularly for the criminal defendants, risks

9    about the Fifth Amendment.

10            MS. GILBRIDE:  Well, Your Honor, that leads into

11   really what is the heart of this dismissal motion, which is

12   whether or not there are overlapping facts.  We believe the

13   issue is not whether there's substantial overlap of the facts,

14   but whether the ultimate issues in the two dispute are the same

15   and I think that that's clearly the test under Illinois law,

16   which we submit applies to this dispute.

17            And the ultimate issues in the two cases are

18   ultimate facts, the ultimate issues that the Court must

19   determine are entirely different.  The facts in the coverage

20   dispute concern -- we have a warranty letter that we received

21   from the insured.  The question is was the warranty letter

22   signed.  It was signed on behalf of all insureds.  Was there

23   knowledge by Mr. Bennett or any other insured at the time that

24   warranty letter was signed which might have led anyone to

25   assume that there could potentially be a claim.

29

1              Those issues are very different than the issues

2    that are in dispute in the securities fraud action, Your Honor.

3    You know, Axis does not have to establish that there was a

4    fraud here.  They simply have to establish that there was

5    knowledge that there was this warranty letter that was signed.

6    There's a knowledge exclusion in the policy, which we

7    understand there's issues about that.  Those issues are not in

8    dispute in the underlying securities litigation.

9              THE COURT:  I'm sorry.  Knowledge of what?

10             MS. GILBRIDE:  Knowledge of whether or not there

11   were facts at the time that the policies that was entered into

12   that could potentially lead to a claim.  That doesn't --

13             THE COURT:  And isn't the -- all of the litigation

14   brought against the Ds and Os a "claim" or potentially a

15   "claim"?

16             MS. GILBRIDE:  It is, Your Honor.  But it's not the

17   only claim that either Mr. Bennett or any other insured could

18   have had knowledge of at the time they signed that warranty

19   letter.

20             THE COURT:  But it's the only claim that they're

21   claiming on the policy on.

22             MS. GILBRIDE:  Well, I think it's -- you know, it's

23   a big picture "claim," but there were other issues and it's

24   important to note that the warranty and the prior knowledge

25   exclusion don't require knowledge of a claim.  They require

30

1  knowledge of a fact, a circumstances, a situation.  It's

2  extremely broad, Your Honor.

3          So, for example, if there was an auditor's letter

4  that was written in 2003 that Mr. Bennett was aware of and he

5  was aware that there were issues raised in that auditor's letter

6  that could potentially result in a claim and which ultimately

7  did result in partially at least in some of the claims.

8          THE COURT:  But aren't I right in assuming that by

9  now any litigant or more practically speaking any plaintiff's

10  lawyer would have jumped in and brought the claims against

11  these directors and officers and that therefore it's in the

12  litigation that's pending?

13          MS. GILBRIDE:  I think that that's a correct

14  assumption, Your Honor.

15          THE COURT:  So aren't I also correct that in that

16  litigation that's pending won't those people also want to obtain

17  discovery of auditor's letters that he might've been aware of or

18  that any of the other directors might have been aware of or any

19  of the other facts that would relate to a claim, because that's

20  what they're trying to establish, a claim.  Isn't it a complete

21  overlap of the policy?

22          MS. GILBRIDE:  Your Honor, I think there's no

23  question that there are overlapping facts in dispute.  There's

24  no question.  But the ultimate facts and the ultimate issues

25  that need to be decided in the coverage dispute are much

31

1   narrower and more focused than the very broad issues that are

2   in dispute in the underlying securities fraud litigation.  And

3   in fact, the coverage --

4           THE COURT:  I thought you were making the argument

5   the other way around.  I thought you were saying that, in fact,

6   the securities litigation is more focused because we could

7   be -- anything that might have gone through Bennett's mind could

8   exclude Axis from having to pay.  I mean, that's a pretty -- I

9   mean, I guess that's something that you can assert given the way

10  that provision is phrased -- "might give rise to a claim" --

11  although it kind of makes you wonder whether the insurance is

12  completely illusory.  But you're saying that the -- maybe I

13  misunderstood you then.  You're saying that the actual

14  litigation, the criminal litigation and then the securities

15  action and the like would be more narrowly focused or wider

16  focused?

17          MS. GILBRIDE:  I think, you know, narrow or wider

18  in different areas I think, Your Honor, but the important issue

19  is that the ultimate facts to be determined in the two actions

20  are different, and I think that's the test.  No one in the

21  securities litigation is going to care one way or the other

22  factually whether or not Mr. Bennett signed a warranty for an

23  insurance application.  That's simply not going to be an issue.

24          THE COURT:  Well, if you're talking that there's a

25  factual dispute as to whether the thing was actually executed?

1      MS. GILBRIDE:  I don't really think that's in

2  dispute, but that is, in fact, what we have to establish in

3  order to prevail in our coverage.

4      THE COURT:  But don't you think that the district

5  judge presiding over that litigation could decide that pretty

6  quickly?

7      MS. GILBRIDE:  Your Honor, I don't think that's an

8  issue that's before the district judge.  It's not an issue --

9      THE COURT:  No, but if, in fact, I determine that

10  this litigation before me is premature, particularly in light

11  of my very tenuous jurisdiction given that Refco's plan is

12  confirmed and effective and the provisions of the confirmation

13  order, which clearly contemplate that this type of litigation

14  could be elsewhere, why shouldn't the -- why shouldn't the easy

15  lifting issue not control this thing and the hard lifting issue

16  should, i.e., all the discovery as to whether there really was

17  something related to a fraud, which is already before the

18  district courts which probably have those issues?  What --

19  they're going to be doing the heavy lifting.  Why have two

20  courts do the heavy lifting, which requires all the parties to

21  duplicate the heavy lifting in two different forums because of

22  what appears to be perhaps even a hypothetical issue as to

23  whether Bennett signed the memorandum, which is easy lifting?

24  Why not have the district judge do that, too?

25      MS. GILBRIDE:  Your Honor, I -- you know, another

33

1   procedural conundrum that we're faced with here is that

2   dismissal is not sought by all of the insureds, so -- and there

3   are --

4              THE COURT:  No, but I can --

5              MS. GILBRIDE:  -- counterclaims --

6              THE COURT:  In controlling my docket, I can

7   certainly do that, particularly when I have real doubts about

8   jurisdiction.  That's what Judge Gonzalez did in <u>WorldCom</u>.

9              MS. GILBRIDE:  Your Honor, I -- you know,

10  obviously that is within your discretion and your control.  Our

11  position simply is that this is a dispute that does not involve

12  all of the over-arching issues that are involved in the

13  securities litigation.

14             THE COURT:  But other than whether Mr. Bennett

15  signed the memorandum or the warranty, what other issues are

16  different?

17             MS. GILBRIDE:  Just the very fact of the

18  insurance, Your Honor, it's not an issue in the underlying

19  securities litigation.

20             THE COURT:  What do you mean by that?

21             MS. GILBRIDE:  Whether or not there's coverage,

22  whether or not their defense costs are covered.

23             The issue -- the other motion that we're here on

24  today, the advancement of defense costs, whether or not those

25  defense costs will be covered, that's not an issue that is in

34

1   dispute or before --

2                   THE COURT:  It could certainly --

3                   MS. GILBRIDE:   -- Judge Lynch.

4                   THE COURT:  It can certainly come before Judge

5   Lynch, though, couldn't it?  I mean, it came before Judge Cote

6   after Judge Gonzalez said he didn't have jurisdiction in

7   WorldCom.

8                   And as a practical matter, as we all know,

9   litigations are also a forum for settlement, and as we all know

10  insurance in these settings is a major aspect, sometimes the

11  only aspect, but always a major aspect of the currency for

12  settlement.  So I would think whether it's Judge Lynch or a

13  special master he's going to appoint or a mediator, that's --

14  you know, it's going to be front and center there as a practical

15  matter.

16                  And I'm sure that if there's a mediation or

17  settlement discussion in the securities litigation -- obviously

18  this doesn't apply to criminal litigation, but in the securities

19  litigation -- that one of the issues that the insurers will

20  raise, even if it's not teed up formally in front of Judge

21  Lynch, but in the negotiations is, well, "we don't have to pay

22  for this.  It's not covered, so, plaintiffs' lawyers, you should

23  look somewhere else.  Lower your demand, because you're settling

24  two things."  You're not only settling the fraud case, you're

25  settling whether this exclusion applies.

1          MS. GILBRIDE:  Well, Your Honor, one of the

2     practical issues that Axis faced in deciding which forum to

3     bring this litigation in is that there is no diversity

4     jurisdiction, so we could not be before Judge Lynch or any

5     other district judge, so there was no way for us as a practical

6     matter to get before Judge Lynch.  That was a consideration,

7     but we felt it was appropriate to bring the action in this

8     court, Your Honor, because of the fact that obviously that

9     we're -- you know, the bankrupt -- the debtor is here before

10    Your Honor and, you know, based upon prior rulings of Your

11    Honor with respect to the insurance policy, we believe that

12    this was an appropriate forum to be in.

13         THE COURT:  Well, I haven't made any rulings as --

14    you mean, the lift stay issue?

15         MS. GILBRIDE:  Yes, Your Honor.

16         THE COURT:  Okay.  But the plan confirmation order

17    says that "Notwithstanding anything in the plan or confirmation

18    order to the contrary, nothing in the plan or confirmation

19    order including, but not limited to the injunction provisions

20    shall be construed to prevent present or former directors and

21    officers of the Debtors from seeking and obtaining coverage and

22    payments from insurance policies of Refco, Inc. or from

23    insurance policies of any other Refco Entity by litigation

24    against relevant insurance companies nor to prevent insurance

25    companies, from making such payments."

1          MS. GILBRIDE:  Your Honor, we don't read that as

2   allowing us to affirmatively bring a declaratory judgment

3   action.  And perhaps it was an incorrect reading of that

4   provision, but our understanding was that was limited to the

5   individual directors --

6          THE COURT:  Okay.  But it's a --

7          MS. GILBRIDE:  -- and officers.

8          THE COURT:  -- big difference between seeking

9   relief from the stay and starting, you know, a whole

10  declaratory -- anyway, I'm not faulting you on that. Obviously,

11  we're here.  But I'm still having a hard time seeing why there

12  isn't overlap.

13         MS. GILBRIDE:  Your Honor, I could not stand in

14  front of you and honestly say there is no overlap.  There is

15  absolutely overlap.  It's just a question of whether the overlap

16  is of some facts, and there are some, many facts that are -- do

17  overlap, but there's not overlap of the ultimate facts and the

18  ultimate issues that are going to be determined in each

19  litigation.

20         This is a dispute that's about coverage.  There are

21  some issues that are similar that we've raised in terms of

22  Mr. Bennett's knowledge and other insureds' knowledge, but the

23  issue before Your Honor is an issue of policy interpretation,

24  contract interpretation.  The issue in the securities

25  litigation is an issue of whether or not there was fraud on the

37

1  shareholders, and that's certainly not an issue that's in our

2  case, whether or not there was a fraud.

3          THE COURT:  But --

4          MS. GILBRIDE:  So we don't believe that the

5  ultimate issue is --

6          THE COURT:  But isn't Mr. Walsh's argument right

7  that the prior knowledge of a claim that's the ultimate basis

8  for the disclaimer of coverage here and of defense costs, the

9  obligation to advance defense costs, isn't that different than

10 the types of fraud at issue in the Guidant [Ph.] case?

11         MS. GILBRIDE:  Your Honor, you know, I think that

12 the Guidant case is very on point with the issues that are at

13 issue here.  In Guidant, the question was whether or not there

14 was a nondisclosure of an underlying situation to the insurer.

15  It's the very same issue --

16         THE COURT:  No, but of what?

17         MS. GILBRIDE:  Of whether or not there was

18 litigation or prior claims, so it's almost -- it's very on

19 point, Your Honor.

20         THE COURT:  But your provision doesn't say that.

21 You're not looking to deny coverage here because Bennett didn't

22 disclose to you that there was an investigation in place and

23 that there was a claim that had been asserted.  It's that the

24 condition that might give rise to something like that was not

25 revealed to your client.

38

1            MS. GILBRIDE:  That's correct, Your Honor, but I

2    think that --

3            THE COURT:  And so --

4            MS. GILBRIDE:  -- the issu --

5            THE COURT:  -- if the fraud actions that were

6    pending in Guidant were not about what was already known to --

7    what specific claims that had been filed were already known to

8    the insured -- they were about whether the insured failed to

9    disclose information to the investing public about what it had

10   been doing with its medical business, if that litigation had

11   been about the failure to disclose -- if the 10K in that

12   litigation had failed to disclose specific litigation claims or

13    medical claims against it, there would have been an overlap,

14   right?

15           MS. GILBRIDE:  Well --

16           THE COURT:  But that's not what it was about.

17           MS. GILBRIDE:  Well, respectfully, Your Honor, I

18   think that issue in Guidant was whether or not -- was about

19   whether or not certain claims were disclosed to the insurer.

20   The situation that we have here --

21           THE COURT:  Not the securities litigation.

22           MS. GILBRIDE:  Not the securities litigation.

23           THE COURT:  Right.

24           MS. GILBRIDE:  But the claims involving the

25   products.  But I -- you know, respectfully I just, I think that

39

1    it's -- the question is whether or not there was nondisclosure

2    and whether it was about the securities litigation or not

3    securities litigation.  It was about facts that were known at

4    the time.  Here --

5              THE COURT:  No, but it's important to know what --

6    to distinguish what the particular facts are.  I mean, the

7    policy if -- if you're the -- if you're the court presiding over

8    the insurance dispute, you have to ask yourself, well, what

9    will I learn from the securities law action that will either be

10   dispositive or provide real guidance as to my dispute.  And in

11   the <u>Guidant</u> case if you're the judge presiding over that

12   insurance dispute, I'm not sure that those facts are relevant

13   because it's a different type of fraud.  There are two different

14   types of fraud that are being litigated.  The fact -- the

15   underlying nondisclosure is different.

16             MS. GILBRIDE:  I think that's -- it's correct that

17   the underlying nondisclosure was different.  There's no

18   question, but I think it was the fact of the nondisclosure that

19   was the issue and it was the same issue in both cases but the

20   ultimate issue in both cases was different, so I believe that

21   the <u>Guidant</u> -- how the <u>Guidant</u> court determined that issue is

22   very instructive in this situation for Your Honor.

23             THE COURT:  But isn't this doctrine of prematurity

24   or ripeness, isn't it really ultimately a doctrine based upon

25   considerations of fairness and efficiency as opposed to, you

40

1    know, distinctions or technical distinctions between the

2    ultimate issue in each matter?  I mean, obviously the ultimate

3    issue is going to be different in each matter because it's a

4    given that the people suing for securities fraud are not

5    specifically suing to enforce the terms of an insurance policy,

6    so it's -- you know, there's always going to be a difference on

7    the ultimate issue in some respects.

8            MS. GILBRIDE:  Your Honor, I do believe that it is

9    an issue of fairness and judicial economy and I believe -- you

10   know, we have a ripe dispute.  There's no question, but there's

11   a ripe dispute right now between Axis and its insureds.  Axis

12   is getting requests for advancement and requests to -- all

13   sorts of requests for depletion of its policy limits.  So

14   there's no question but that we have a ripe dispute and that we

15   believe that this is the appropriate forum to be in to resolve

16   that dispute.

17           We do not believe -- you know, all of the issues

18   that are in dispute in the securities litigation are not in

19   dispute in this case.  This is -- and I apologize if there was

20   any misimpression given, but I believe this is a much more

21   narrow --

22           THE COURT:  But isn't there always a dispute?  I

23   mean, it's not really a ripeness issue, is it?  If it were a

24   ripeness issue, then this doctrine of overlap wouldn't apply,

25   because the courts don't say that the securities -- that the

41

1    court handling the securities law case has to decide the

2    insurance dispute.  It just says that we're not going to -- we,

3    the insurance court, are not going to decide it.  Now, am I

4    right on that?

5               MS. GILBRIDE:  I think you are right on that, Your

6    Honor.  I think -- and what I was trying to articulate not very

7    clearly apparently was that you were asking whether this was

8    about judicial economy and fairness to the parties and I think

9    that that is what this is about and that is what drives that

10   doctrine, and this -- no one can suggest that this dispute is

11   premature.  This is not a premature dispute.  There is

12   certainly a dispute.  There is a dispute that can be litigated.

13    We believe it will be a much more narrow litigation than the

14   securities litigation that's in the District Court before Judge

15   Lynch.  And we believe that it serves the interests of judicial

16   economy and fairness to all parties.  And, you know, in

17   particular Axis who's being asked to make payments as policy

18   limits without being allowed to get a ruling from a court that

19   there's no coverage under the policy.

20              THE COURT:  But isn't -- doesn't in effect what

21   these overlap cases hold is that the insurer, you know, has to

22   take a back seat on that?  I mean, isn't that a consequence of

23   these decisions?

24              MS. GILBRIDE:  I think that is.  When -- and I

25   think when that happens the reason it happens is because the

42

1    issues that are in the coverage litigation are going to be

2    decided in the underlying litigation.  So, for example, if

3    there's an underlying dispute that involves issues of negligence

4    and issues of intentional conduct and the insurer is saying,

5    well, we don't cover intentional conduct, in those situations

6    courts -- and that's the vast majority of the cases that deal

7    with this issue -- the courts say, well, it's a waste of our

8    time to decide whether there was negligence or intentional

9    conduct, because that will be decided in the underlying case.

10            THE COURT:  Right.

11            MS. GILBRIDE:  Here, that's not the situation.  The

12   coverage issue that we have, whether or not the prior knowledge

13   exclusion applies and whether or not the warranty letter

14   applies, are not going to be decided in the securities

15   litigation.

16            So for those reasons, Your Honor, I don't

17   believe --

18            THE COURT:  I thought you were going somewhere

19   else.

20            MS. GILBRIDE:  -- the dismissal --

21            THE COURT:  I guess I thought you were going

22   somewhere else with that, which is that were going to have to

23   take our chances on advancing or not advancing defense costs

24   pending a decision, and that -- and I thought you were going to

25   say -- that's not fair and the cases don't deal with that issue,

43

1  but don't they?

2       MS. GILBRIDE:  Your Honor, I don't believe they do

3  because as far as I know, there's not one case cited before Your

4  Honor which has the precise language that is at issue in this

5  dispute where Axis is only required to advance covered defense

6  costs.

7       THE COURT:  But that --

8       MS. GILBRIDE:  Not --

9       THE COURT:  I'm sorry, go ahead.

10       MS. GILBRIDE:  No, I was just going to -- none of

11  the cases that have been put before Your Honor deal with that

12  precise issue and that certainly has not been an issue in any

13  dismissal rulings that have been put before Your Honor.

14       THE COURT:  But isn't it the case that the insurers

15  are declining -- in the cases where there's a dismissal without

16  prejudice based on this doctrine of substantial overlap, isn't

17  it the case that the insurers have denied coverage or sought to

18  rescind, which would include rescission of their obligation to

19  pay defense costs?

20       MS. GILBRIDE:  I think in the vast majority of the

21  cases that have so held, Your Honor, the situation was that you

22  have an insurer, a duty-to-defend insurer who was required to

23  advance defense costs, and was taking a position that because

24  there was negligence and intentional conduct they didn't have to

25  defend -- they didn't have to pay defense or provide a defense

44

1   for any of those claims.

2                THE COURT:  Right.

3                MS. GILBRIDE:  So in that situation where the

4   Court said the coverage dispute is premature, the insurer did

5   have a duty to defend the entire action, but our situation --

6                THE COURT:  So it was ripe because they had to pay

7   the money even though they said they didn't have to.

8                MS. GILBRIDE:  It was ripe, but based on the

9   policy language that was in dispute in those cases, I think

10  here the distinguishing fact is that Axis's policy only requires

11  it to advance "covered" defense costs.

12               THE COURT:  But doesn't everyone have a

13  distinguishing fact, that's why they brought their lawsuit to

14  rescind, you know.  I mean --

15               [Laughter.]

16               THE COURT:  I understand your --

17               MS. GILBRIDE:  Yeah.

18               THE COURT:  -- point --

19               MS. GILBRIDE:  Your Honor --

20               THE COURT:  -- of a specific provision, but --

21               MS. GILBRIDE:  Yeah.  I'm not sure how to answer

22  that.  I think that was in jest, but obviously there's always

23  different disputed facts.

24               I don't think I have anything more to add on this

25  issue unless Your Honor has any further questions for me.

45

1          THE COURT:  Okay.

2          MS. GILBRIDE:  But, you know, in summation I would

3  say that, you know, we don't believe dismissal is the

4  appropriate remedy.  If Your Honor is concerned about the

5  overlaps and facts, there are other remedies that could be

6  considered, particularly a stay or stay as part of the action

7  is that was what Your Honor is --

8          THE COURT:  Well, the directors and officers

9  represented by Mr. Walsh are looking for dismissal without

10  prejudice.  They recognize that this issue is going to come up

11  if it's not settled somewhere.  So I mean, isn't that tantamount

12  to a stay?

13          MS. GILBRIDE:  Your Honor, I think they do --

14          THE COURT:  And --

15          MS. GILBRIDE:  -- in the alternative ask for a

16  stay.

17          THE COURT:  Well, someone -- I don't think so.  I

18  think that's the criminal defendants --

19          MS. GILBRIDE:  Okay.  Okay.

20          THE COURT:  -- that are asking for a stay.

21          MS. GILBRIDE:  That's my confusion, then.

22          THE COURT:  I under -- this is kind of off the --

23  you can stay up there if you want.

24          MS. GILBRIDE:  Sure.

25          THE COURT:  But it's addressed to everybody and

46

1   really it's off the point, but I -- does anyone know how the

2   insurance litigation got before Judge Cote?  I would assume

3   that there would have been lack of diversity there as well.

4   Maybe no one argued -- maybe no one raised the issue.

5                    MALE SPEAKER:  Your Honor, I believe there's a

6   motion of jurisdiction --

7                    THE COURT:  There was.

8                    MALE SPEAKER:  -- actions were filed by the

9   carriers in the same courthouse and --

10                   THE COURT:  Okay.

11                   MALE SPEAKER:  -- it was before Judge Cote.

12                   THE COURT:  All right.

13                   MALE SPEAKER:  Little different situation.

14                   THE COURT:  All right.

15                   MR. FERRILLO:  Your Honor, Paul Ferrillo from

16  Weil, Gotshal.  I was with Mr. Borgeest in that case, too.

17  There's another piece to that was I think Judge Cote took part

18  of this on the related jurisdiction and that the --

19                   THE COURT:  Under bankruptcy.

20                   MR. FERRILLO:  It was -- yes, on -- for the 1334.

21   She took a piece of it on the 1334.

22                   THE COURT:  Well, that's conceivable here, I would

23  think.  I mean, I -- as I said, I've got -- I raised this

24  jurisdictional issue at the pretrial conference and I was

25  convinced enough then, since the policy is property of the

47

estate, and there's some possibility that it will flow over in

some way to the estate, that there could be jurisdiction here,

but as you all know my jurisdiction becomes constricted after a

plan goes effective.  And while it may still exist, it may

much -- it may more -- much more readily be employed by the

District Court that in an action that for a lot of reasons it

would be efficient for the District Court to employ it that

way, so I wouldn't necessarily rule out that you couldn't raise

it in that forum, but that's neither here nor there, I guess.

MS. GILBRIDE:  Thank you, Your Honor.

THE COURT:  Okay.

MR. WALSH:  Except a couple points, Your Honor.

First of all, I don't have any problem with your jurisdiction in

this case, but I understand the posture of the case is in --

THE COURT:  Well, let me be clear.  I've not

determined that I lack jurisdiction.  It's just that I need to

be careful about it and not over-extend it and let other issues

sort of creep in through the limited jurisdiction that I have.

MR. WALSH:  I appreciate that, Your Honor.

I just wanted to respond to a couple of things

that were said.  And perhaps I heard this wrong, but I thought

what was said was that what -- in Guidant the standard was not

a substantial overlap and I think that's incorrect.  Guidant

says "As a general matter a declaratory judgment action to

determine an insurer's duty to indemnify its insured should not

48

1  be decided prior to the adjudication of the underlying action

2  where the issues to be decided in both actions are

3  substantially similar." So that's the standard under <u>Guidant</u>.

4       And we have essentially the same effect in New

5  York in the <u>Xerox</u> case where the Court said that "The general

6  rule is that a declaratory judgment as to a carrier's obligation

7  to indemnify may be granted in advance of trial of the

8  underlying tort action only if it can be concluded as a matter

9  of law that there is no possible factual or legal basis on

10  which the insurer may eventually be held liable under this

11  policy." So I think that that sets the standard. It doesn't

12  have to be, you know, precisely the same.

13       And, in fact, if there wasn't a substantial

14  overlap, I have to ask the question why is it that Axis spent

15  five pages and 20 paragraphs reciting the allegations in the

16  indictment and the Grant memo? I think the only answer is

17  because those facts are key to the issue of -- that there had

18  to be disclosure of claims.

19       The only other thing I want to point out is the

20  contract, and maybe this goes to the issue of fairness, but the

21  contract requires advancement unless there's a "final

22  determination," and I think that's the quandry that Axis finds

23  itself in and that's what they should do. They should live up

24  to their contract. Thank you, Your Honor.

25       MS. GILBRIDE: Your Honor, just briefly because I

49

1  can't let it go unchallenged, but the policy does not require

2  advancement.  It requires advancement of "covered" defense

3  costs, but --

4         THE COURT:  I know.  Mr. Walsh sort of cut back

5  his statement that he wasn't seeking a determination as to the

6  policy.

7         MS. GILBRIDE:  And it's a very key word in the

8  policy and it's, you know --

9         THE COURT:  I understand there's a heated dispute

10  over that issue.

11                    [Pause in the proceedings.]

12         THE COURT:  Does anyone else want to be heard on

13  this particular motion; that is, the motion to dismiss?

14         MR. GOLDMAN:  Your Honor, Matthew Goldman.  I'm

15  assuming that the Court will proceed after this two-hour

16  motion.  It's --

17         THE COURT:  Yes.

18         MR. GOLDMAN:  -- our view obviously that -- I've

19  listened to a lot of what I was going to say already being

20  discussed with the Court, so --

21         THE COURT:  Okay.

22         MR. GOLDMAN:  -- I presume I'll get an opportunity

23  to be heard on that issue, Your Honor.

24         THE COURT:  Okay.

25         MR. GOLDMAN:  Thank you, Your Honor.

1          THE COURT:  Absolutely.  Also, the motion for

2    relief from the stay.

3                    [Pause in the proceedings.]

4          THE COURT:  All right.  I have before me a motion

5    by certain defendants in this adversary proceeding, namely

6    Messrs. Brightman, Gantscher, Harkins, Jaekel, Lee, O'Kelly and

7    Schoen, who define themselves as the "director defendants," to

8    dismiss the adversary proceeding under Federal Rule 12(b)(6)

9    incorporated by Bankruptcy Rule 7012.  The standard for

10   determining a motion to dismiss is well recognized; that is,

11   the Court must accept all factual allegations in the complaint

12   as true, although the plaintiff must plead more than labels and

13   conclusions, and a formulaic recitation of the elements of the

14   cause of action will not do. See Bell Atlantic Corporation v.

15   Toombley, 127 Supreme Court 1965, 1995 (2007).  But, with the

16   caveat announced in the Bell Atlantic case or reaffirmed in the

17   Bell Atlantic case, the Court should determine whether, based

18   on the facts set forth in the complaint as well as other

19   sources that the courts are permitted to examine under Rule

20   12(b)(6) (including in particular documents incorporated in the

21   complaint by reference and matters which the Court may take

22   judicial notice of), the plaintiff should be entitled to

23   ultimately submit evidence and establish the facts alleged or

24   whether it should be precluded as a matter of law from going

25   forward.  Here these particular debtor defendants -- director

1    defendants -- are seeking dismissal without prejudice on a

2    relatively narrow basis.  That is, unlike certain of the other

3    beneficiaries of the Axis Reinsurance policy, they're not asking

4    the Court to determine that Axis is required to advance defense

5    costs by the terms of the policy.

6         Instead, although they're obviously not agreeing

7    with Axis's position that it's not required to advance those

8    costs, these director defendants contend that because of the

9    substantial overlap of the issues raised by Axis's declaratory

10   judgment complaint with the issues pending in respect of the

11   underlying claims which the beneficiaries contend trigger their

12   rights under the policy in the District Court in pending

13   securities litigation as well as in any other litigation, but

14   primarily that litigation, that the Court should not proceed

15   here with a determination of essentially those same issues, or

16   at least issues that substantially overlap with the issues

17   pending in the District Court.

18        This basis for dismissal without prejudice is well

19   recognized in the case law.  See National Union Fire Insurance

20   Company v. Xerox Corporation, 792 N.Y.S. 2d. 772 (New York

21   Supreme Court 2004), affirmed 807 NYS 2d. 344 (New York

22   Appellate Division 2006) as well as In Re:  Adelphia

23   Communications Corporation, 302 B.R. 439 (Bankr. S.D.N.Y.

24   2003).

25        It is not only, however, a principle in New York,

52

but also recognized, it appears to me, based on reading the

parties' pleadings, generally throughout the country; and Axis,

I believe, acknowledges the fundamental proposition that if

there is a substantial overlap of the issues in coverage

litigation with other pending litigation related to the claims

to be covered that the coverage litigation should take the back

seat.

Axis contends, however, that as a factual matter there is

not an overlap that would require a dismissal here.  It relies

heavily upon a decision out of Illinois, <u>Alliance Insurance</u>

<u>Company v. Guidant Corp.</u>, 839 NE 2d. 113 (Ill. App. 2005) in

making its argument.

I should note, however, that the <u>Guidant</u> case

enunciates the general proposition that a declaratory judgment

action to determine an insurer's duty to indemnify its insured

should not be decided prior to the adjudication of the

underlying action where the issues to be decided in both

actions are substantially similar.  That's at page 120.

So it appears to me, at least on the general

proposition, that there's no real conflict between the law of

New York and the law of Illinois here -- on this key

proposition of law.  And where there is no such conflict, the

court need not continue with a choice of law analysis.

However, I will do so because there is some

distinction, although I don't think a major one, between how the

53

1  <u>Guidant Corp.</u> case -- I'm sorry, the <u>Guidant Corp.</u> court

2  analyzed the overlap issue from how other courts have done so

3  in New York.

4         In that regard, although this is more relevant to

5  Axis's interpretation of its rights in respect of the policy

6  generally, which are not being litigated here by these

7  particular director defendants, Axis contends that this dispute

8  in this declaratory judgment action is governed by Illinois

9  law, whereas the director defendants contend, to the contrary,

10 that it should be governed by New York law.

11        I've not seen a provision in the policy itself

12 setting forth the choice of law, and no one has cited that to

13 me.  Instead, they have properly set forth the choice of law

14 rule in the absence of such a provision, which is that New York

15 choice of law rules should apply here given that this action is

16 being determined by a court in New York, and that the center of

17 gravity analysis (which, as far as I'm concerned, is

18 substantially the same as if not entirely the same as

19 substantial contacts analysis) would apply as to disputes in

20 respect of insurance coverage.

21        The parties also generally agree on the factors to

22 be considered in connection with such an analysis.  In looking

23 at those factors here, and taking note particularly of Refco,

24 Inc.'s headquarters and the place where its executives took the

25 actions or allegedly took the actions at issue here, as well as

54

1    the residence of substantially all the defendants, the

2    headquarters of the insurer, but primarily where the underlying

3    activity occurred, it appears to me that New York law should

4    apply.

5            And, therefore, to the extent that there is any

6    substantive difference on the so-called "substantial overlap

7    doctrine," I would follow the dictates of New York law and as

8    it applied by the New York cases.

9            In considering those cases, it appears to me that

10   the rationale for applying the doctrine fits these particular

11   circumstances.  That rationale is twofold.  First and most

12   important, it reflects a policy not to prejudice the parties'

13   rights in the underlying pending action with the risk of -- in

14   particular in criminal actions, but also in civil actions --

15   having to make disclosures and litigate in two forums with

16   potentially inconsistent results; and, as importantly in this

17   context -- and particularly given the insurance context and the

18   issue of advancing defense costs, greatly increased cost --

19   that rationale dovetails into the second rationale, which is

20   one based on judicial efficiency.

21           As discussed at oral argument, it appears to me

22   that this is not -- this doctrine is not really one that should

23   best be defined as "ripeness," per se, because there is

24   obviously a ripe issue that is being deferred in the cases that

25   apply the doctrine.  That is, the insurer contends one way or

1    another that it is not responsible for paying under its policy,

2    but the courts say nevertheless that that issue should not be

3    decided first where there's substantial overlap with the

4    underlying litigation.  Rather, the insurer should either

5    perform its obligations or at its own risk not perform them and

6    contend later that it never had an obligation to perform them

7    as the underlying litigation proceeds.

8            I note in this respect that as set forth at length

9    by Judge Cote in In Re:  WorldCom Inc. Securities Litigation,

10   354 F. Supp. 2d. 455 (S.D.N.Y. 2005), there are strong policies

11   under New York law with regard to interpreting insurance

12   policies in favor of the insured -- particularly in construing

13   the meaning of exclusions incorporated into a policy of

14   insurance or provisions seeking to narrow the insurer's

15   liability -- and, further, that the distinct and separate duty

16   of an insurer to pay defense costs, that is, distinct and

17   separate from a duty to indemnify, is broader than the duty to

18   indemnify and not to be taken lightly as a policy matter.  That

19   may help to explain in addition to notions of fairness and

20   efficiency why this doctrine goes beyond the doctrine of

21   ripeness.

22           Now, turning to Axis's argument that there is not a

23   substantial overlap between the litigation pending before me

24   and the multi-district securities litigation and other

25   litigation that it is asserted by the defendants here to give

1  rise to an obligation to advance defense costs (and if

2  liability is ultimately found or there's a settlement, an

3  obligation to pay indemnification), it appears clear to me that

4  there is indeed a substantial overlap between that litigation

5  and the declaratory judgment litigation before me.

6         Axis as set forth in its complaint is relying

7  primarily, although not exclusively, upon a "warranty" letter,

8  so called by Axis, received at the time that -- or "in

9  connection with," in the words of the complaint, "the

10 underwriting of the Axis policy."  That warranty letter

11 provides as follows:  "(a) No person or entity proposed for

12 this insurance is cognizant of any facts, circumstance,

13 situation, act, error or omission which he, she, it has reason

14 to suppose might afford grounds for any Claim [as such term is

15 defined in the policy] such as would fall within the scope of

16 the proposed insurance" and then one exception is listed to

17 that.

18         And then "(b) No person or entity proposed for this

19 insurance is cognizant of any inquiry investigation or

20 communication which he, she, it has reason to suppose might

21 give rise to a Claim [as such term is defined within the

22 policy] such as would fall within the scope of the proposed

23 insurance."

24         Other bases for the rejection of coverage are set

25 forth in paragraphs 49 and 50 of the complaint, as well as

1   paragraphs 52 and 53, but it seems to me that, leaving aside

2   issues of what's in the policy itself as opposed to what's

3   extrinsic to it and may give rise to some other claim, the

4   focus of the discussion regarding overlap has been over the

5   language quoted, and more particularly over the language quoted

6   in paragraph "(a)" of the so-called warranty.

7           It appears to me that if one considers the fact

8   that the plaintiffs in the securities fraud litigation are

9   suing the defendants in respect of "claims" or what would be

10  "claims" if they prevailed, they will be seeking in discovery

11  and seeking to prove, the defendants' "cognizance of

12  circumstances, situations, acts, errors or omissions that would

13  give rise to such a claim," i.e., their knowledge of, and/or

14  participation in frauds and other bases for the claims in the

15  securities action.  That will be the subject of the discovery -

16  - which, as is evident by the enormous costs that have already

17  been incurred (and I note here that we're now here in the third

18  layer or the second layer of excess coverage), is enormous --

19  multi-million dollars -- the plaintiffs will be, if they've not

20  already been, seeking to obtain from the defendants. Those are

21  also the issues that I believe that if the litigation is

22  decided on its merits will be determined by the District Court.

23

24          As I said in oral argument, I believe those are

25  also issues that would come up in any settlement discussions

58

with the insurer and the insurer's inevitable statement to the
plaintiffs that even if the defendants are liable the
plaintiffs shouldn't look to the insurers because they
disclaimed coverage under this warranty and the other
provisions set forth in the complaint.

So I believe that there is indeed a substantial
overlap between the issues raised in the complaint and the
pending litigation.  That's highlighted by the fact that the
complaint relies almost exclusively, if not exclusively, on
recitations from either -- well, recitations from documents
filed in the securities action or related criminal proceedings
to establish the breach of the warranty and the insurer's rights
under the other exclusions referred to in the complaint.

I believe these facts distinguish this matter from
the matter before the Court in the _Guidant_ case, where it
appears clear to me that the court considering insurance
coverage issues in the _Guidant_ case had to consider different
underlying factual issues as to the nature of the -- as to a
different type of fraud that would have given rise to arguably
a denial of coverage.

As I noted at oral argument, the issues that do
not overlap here -- and inevitably there will be some because
we're dealing with here an insurance policy as opposed to the
facts that might give rise to a right under the policy or under
related documents to disclaim coverage -- should not guide my

1  decision.  Those differences do not call into question issues

2  of efficiency or fairness.  As I said before, the heavy lifting

3  in this dispute is over the underlying factual point as to

4  whether there was knowledge of conditions giving rise to a

5  "claim."  That's heavy lifting in the first instance by the

6  parties in their discovery and in the second instance by the

7  parties and the court in determining the merits of that

8  contention, and that's already going to be taking place in the

9  District Court.  It seems to me that, therefore, this

10 litigation should be deferred under the substantial overlap

11 cases to await determination by the District Court of those

12 underlying issues.

13           It also seems to me that there is a basis as

14 discussed in oral argument, if the District Court agrees, for

15 the District Court to have jurisdiction over these issues if

16 they are to be teed up there, as was done in the WorldCom

17 Securities case, which involved a similar situation where a

18 plan had been confirmed and gone effective and the bankruptcy

19 court had some concern about how involved it should be in

20 issues that should be primarily between third parties to the

21 bankruptcy case.

22           So on that basis, I will grant the director

23 defendants' motion to dismiss, without prejudice, although I

24 would strongly encourage the parties if they were ultimately to

25 pursue this litigation to pursue it in a different forum

1  because of the jurisdictional concerns that I've raised.

2  　　　　　Mr. Walsh, you can submit an order to that effect

3  after circulating it to counsel for Axis.

4  　　　　　MR. WALSH:  I will do that, Your Honor.

5  　　　　　THE COURT:  And I suppose to your allies in the

6  defendant group.

7  　　　　　MR. WALSH:  Thank you, Your Honor.

8  　　　　　THE COURT:  Okay.

9  　　　　　MS. GILBRIDE:  Your Honor, if I may just to

10  clarify, you've now dismissed the entire litigation?

11  　　　　　THE COURT:  Well, that's my inclination.  I'll hear

12  oral argument, but that's my inclination.  I'll hear oral

13  argument on this motion, but it seems to me it all should go.

14  　　　　　MS. GILBRIDE:  Your Honor, it seems to me if

15  another court, another forum is going to hear this issue, there

16  really is no --

17  　　　　　THE COURT:  Well, you know what?  As far as the

18  other defendants are concerned, that's my preliminary ruling.  I

19  don't want to -- I said specifically to Mr. Goldman and his

20  colleagues that I would hear them out on this other point, but

21  that's my strong inclination.

22  　　　　　In other words, he has an uphill fight.

23  　　　　　MR. GOLDMAN:  And I heard that, Your Honor.  Okay.

24  　So I guess it's one of the disadvantages of going last.  You

25  get so many other things resolved for you and said.  Let me

61

1   make this easier for all -- everyone.

2            First of all, there's no reason for me to discuss

3   facts.  I don't think there's a single fact that has been raised

4   in here in our papers that has not been discussed by the Court

5   so far this morning: the provisions in question, and the

6   primary insurance policy, the follow-on provisions, and et

7   cetera.

8            I would add that I felt and feel that the Court

9   has raised the jurisdiction issue, of course, at the pretrial

10  hearing as well as today.  I will indicate for the benefit of

11  the Court that we in fact -- the reason I stated on the record

12  I believed this Court had subject matter jurisdiction under

13  1334 was that the estate continues to have an interest in

14  potentially obtaining proceeds of these policies; and in that

15  situation I would add, although it's not before the Court

16  immediately, that in the lift stay motion I reached agreement

17  with Mr. Kirschner's counsel that I am to put on the record that

18  we must provide him notice and give him an opportunity to be

19  heard if he wishes to be heard regarding any compromise

20  precisely because he recognizes that that interest is one of

21  import to him and, of course, we have no difficulty with that.

22            The Court did recognize as I had neglected to in

23  my moving papers, but did remember last night, that the plan

24  confirmation order in fact dealt with the lift stay issues that

25  were raised, but I don't think that that changes the Section

1   1334 issue and I don't think that the Section 1334 basis for

2   jurisdiction --

3          THE COURT:  No, I'm not --

4          MR. GOLDMAN:  Yeah.

5          THE COURT:  I agree with you.  I'm not -- and my

6   holding is not based on a finding that I lack jurisdiction,

7   only -- it only reflects that it's another factor in the

8   conclusion I reached that under the substantial overlap cases

9   the underlying basis for that doctrine would apply here, which

10  is that as bankruptcy cases end there's kind of a fade in the

11  role of the bankruptcy court. And when the case law is already

12  pointing you to go to the other court, that's another factor

13  that just increases my inclination to send it to the other

14  court.

15         MR. GOLDMAN:  I understand, Your Honor.  I would

16  add -- I would recognize, as we all must, the brave new world

17  of post-confirmation jurisdiction as it is, but I would add

18  further and would stress for the Court -- Your Honor, you have

19  acknowledged, I think, all of as I said the facts that I would

20  have reported to you in respect of our preliminary injunction

21  motion.  The one which I think you've also acknowledged earlier

22  in these arguments is that we are -- that Axis is, as they say,

23  up to bat.

24         The harm which Judge Cote identified for us as

25  defendants and actions particularly, of course, for the people

63

1   on whom -- on whose bases I speak who we have usually

2   characterized as the so-called innocent defendants is that we

3   will have disruption which Judge Cote identified as harm that

4   it has to be addressed immediately.  Lexington is out.  We are

5   facing immense obligations to proceed in these matters and we

6   need to have a lack of disruption of our ability to have a

7   defense mounted on behalf of the defendants.

8           I would add also the Court has identified that

9   Axis is relying and primarily on an interpretation of the word

10  "covered" in its policy language to argue that they can make

11  that determination on their own and ignore the obligation to

12  advance the costs -- defense costs "as incurred" with a

13  concomitant right of access to seek recoupment later on after

14  it is "finally determined" that -- presumptively by a court and

15  not by Axis -- that the defense costs should not have been

16  advanced.

17          And, of course, as the Court has already

18  acknowledged, this is language which has been identified as

19  important as a matter of case law and policy both by Judge Cote

20  and in the Kozlowski [Ph.] case.

21          We face that concern now.  We face the need for

22  the Court and not Axis to determine their obligation to advance

23  defense costs.  It is not just because they say so.  We face

24  the need now for a determination that it is covered as we have

25  identified in our moving papers, and, of course, the Court is

64

1    clearly familiar with them.  The case law is consistent that it

2    is simply a question of looking to see whether the issue in

3    dispute fits within the policy.  This is a securities

4    litigation.  It is expressly with an ensuring agreement (a) the

5    word "securities litigation" is there.  If this was a medical

6    malpractice case against one of these people, it'd be an

7    entirely different policy, but that's not the issue.  That's

8    what coverage is all about.  So we believe, Your Honor, that we

9    have merited or established a basis to proceed with the

10   preliminary injunction.

11           As the Court is well aware, we proceeded in the

12   manner that -- of a preliminary injunction -- as had happened

13   in <u>WorldCom</u>.  We believe we have the basis to prevail.  We

14   believe we've shown the necessary likelihood of success to do so

15   and given that we are going to face an almost immediate

16   disruption in defense efforts, we would ask the Court now to

17   enter the preliminary injunction with the understanding that we

18   would then be able to address any further issues that the Court

19   has at a later time.

20           Your Honor, my co-counsel reminds me that to the

21   extent that the Court is concerned about issues attentu --

22   dealing with the underlying merits, which we do not believe are

23   necessary to address in this situation, it is possible for the

24   Court to stay such portions of this proceeding.

25           As the Court is aware, this is a request for

65

1   partial relief.  That is what Judge Cote was looking at.  It's

2   not a request for complete relief.  It's a request for

3   advancement.  Thank you, Your Honor.

4               THE COURT:  Okay.

5               MS. GILBRIDE:  Your Honor, in view of the Court's

6   ruling on the prior motion, I believe that this issue of

7   advancement should be left for another court.  Since Your Honor

8   has deferred this litigation to another court, we're clearly

9   going to be in front of another court on this coverage issue

10  and I think in view of the Court's ruling on the director

11  defendants' motion that the Court should not rule on the

12  preliminary injunction hearing before it.

13              Be that as it may, with respect to the preliminary

14  injunction, we think that there's a very high standard that the

15  insureds must get past in order to get a preliminary injunction

16  with respect to defense costs.  We don't think they've even come

17  close to satisfying that.  They have not established

18  irreparable harm.  They've not even tried to establish

19  irreparable harm.

20              We don't think that they can establish the

21  likelihood of success on the merits.  Whether it's a substantial

22  likelihood or not, you know, we believe that it would be a

23  substantial likelihood that they have to establish because we

24  do believe that this is a mandatory injunction that they're

25  seeking and seeking to change the status quo.  The status quo

66

1   right now and has been for the past year is that Axis has

2   denied coverage for this case.

3            With respect to the merits of Axis's coverage

4   position, the policy language before Your Honor that's at issue

5   in this hearing is not the language that was before the Court

6   in the <u>WorldCom</u> hearing or in any of the -- the Kozlowski

7   hearing.  It was not the language that was at issue in any of

8   those cases.

9            Axis's language clearly states that they have to

10  advance only "covered" defense costs and the argument that's

11  being advanced by the insureds simply ignores that language.

12  There's another section of the policy --

13           THE COURT:  Well, I think they're saying that if

14  you interpret it the way Axis wants, then, in fact, the other

15  language that you're -- I think you're about to quote to me --

16  would be superfluous, which is, you know, fundamental contract

17  interpretation doctrine that you should never render another

18  provision superfluous, but --

19           MS. GILBRIDE:  I think if you look at the entirety

20  of Section (d) it's clear that that language is not superfluous.

21   It starts out by saying that Axis will advance covered defense

22  costs.  It then goes on to talk about if Axis advances defense

23  costs and ultimately they're not covered that they're ripe --

24  they're subject to recoupment by Axis.  That's for the situation

25  where there is an exclusion upon which an insurer reserves

67

1  rights, for example, a fraud exclusion that requires an

2  adjudication of fraud.  In that circumstance, the insurer would

3  reserve rights subject to a final adjudication of fraud and

4  then seek to recoup those defense costs at the end of the

5  litigation of the underlying case.

6          Section (d)(3), which is the allocation provision,

7  must also be considered in this context and the allocation

8  provision clearly says that if there's a dispute as to covered

9  and uncovered claims, the parties have to exercise best efforts

10 to come to a determination.  But if they cannot, then Axis must

11 only advance undisputed defense costs and --

12          THE COURT:  I probably opened up a can of worms,

13 because I -- not that I'm not fascinated by these contract-

14 interpretation points -- but because I think the ultimate issue

15 here is -- well, they're not making a motion for summary

16 judgment based on interpretation of the insurance policy.  It's

17 his motion for an injunction, so --

18          MS. GILBRIDE:  I --

19          THE COURT:  -- I understand.

20          MS. GILBRIDE:  Okay.  So, Your Honor, our position

21 is that based on your prior ruling, we don't believe that Your

22 Honor should rule on this motion for preliminary injunction,

23 but if you do, we don't believe that they've satisfied the

24 procedural threshold for recovery under Rule 65.

25          If Your Honor was so inclined to grant relief our

68

1    position is that Axis would request that there be a bond

2    established by the insureds that are seeking this relief that

3    would provide some assurance for Axis to recover in the event

4    that ultimately at the end of the day Axis prevails in its

5    coverage position.

6              THE COURT:  Okay.

7              MS. GILBRIDE:  Thank you, Your Honor.

8              MR. GOLDMAN:  I will not repeat myself.

9              Your Honor, two items: (1) the papers make this

10   point clear.  If Axis', I would say, strained interpretation of

11   the word "covered" were considered by the Court to be a valid

12   interpretation that would merely create an ambiguity we are

13   right in the situation of the <u>Adelphia / Regis</u> case: that

14   ambiguity should be construed in favor of the insured. But in

15   any event what we would like to stress for the Court is that

16   the urgency given that the Lexington policy exhausted in mid-

17   July of not having a disruption of the defense costs or the

18   reason we've sought injunctive relief and the language -- we

19   would be very happy to have the Court refer the underlying

20   coverage dispute that we will undoubtedly have with Axis and

21   the duty of theirs to step up and ultimately pay the covered

22   policy referred to Judge Lynch but we are requesting that this

23   Court rule on our preliminary injunction at this time in our

24   favor in order to avoid a disaster.

25              THE COURT:  All right.

1            MR. GOLDMAN:  Thank you, Your Honor.

2            THE COURT:  Okay.  Did someone else want to speak?

3            MR. EISEN:  Your Honor, Norman Eisen from

4   Zuckerman, Spaeder on behalf of the officer defendants who are

5   the indicted defendants as well.  I'll be very brief.

6            THE COURT:  Okay.

7            MR. EISEN:  But we joined in the motion and if I

8   may just add a couple of points just to emphasize Mr. Goldman's

9   points which are even more acute as to the three defendants.

10  We are facing trial in March.  The trial was continued from

11  October because of the enormous amount of discovery that needs

12  to be reviewed, so it is an even sharper dilemma for us.  We

13  would submit that the question is the Court having resolved the

14  choice of law question and the applicability of New York law

15  that under the WorldCom case it's a straightforward issue.  The

16  Court can't split this off in the same sense that the previous

17  advancement questions have by consent come before the court on

18  a lis se [sic] posture.  There's a narrow issue here that the

19  Court can separate off comfortably within the scope of its

20  jurisdiction and refer the rest elsewhere and --

21            THE COURT:  Well, I can't refer anything.

22            MR. EISEN:  Understood.  The rest can go elsewhere

23  but there is an independent basis for the Court to say, I will

24  address this narrow question.  It is, given the Court's

25  previous rulings, a straightforward one we think and let the

70

1  parties go off to resolve the issues where they may.  Opposing

2  counsel has made clear that Axis will not pay.  It was

3  virtually the first statement that was made.  It doesn't

4  believe that this is covered.  Months have passed since the end

5  of May when the complaint was filed.  These issues have been

6  joined and have been before the Court on motions for almost two

7  months, as you know, Your Honor is more familiar with the

8  WorldCom case than I am, there was a substantial lapse of time

9  there while these jurisdictional issues were resolved and I

10 think on behalf of all the defendants who are very actively

11 engaged in this civil and/or criminal litigation, but

12 particularly the ones who are facing the criminal issues, Your

13 Honor would really be exercising the Court's equity

14 jurisdiction to address this narrow question and leave the

15 parties to address the larger coverage issues in another forum

16 and with that I will -- unless the Court has any questions for

17 me I'll be seated.

18            THE COURT:  No, that's okay.  Thanks.

19            MR. EISEN:  Thank you, Your Honor.

20            MR. GOLDMAN:  I apologize to the Court.  Your

21 Honor, may I ask the Court's indulgence --

22            THE COURT:  You get the last word.

23            MR. GOLDMAN:  Thank you.

24            I just wanted to add for the Court that I had

25 realized before and should have mentioned that I -- yes, I

71

1   don't think that referral here is actually the option.  The

2   counterclaim is pending.  It's my understanding that the Court

3   does not believe at present it lacks subject matter

4   jurisdiction as to the issues raised by the counterclaim, and

5   so I would on that basis indicate to the Court that since the

6   counterclaim is pending and I believe the Court does have 1334

7   subject matter jurisdiction, that is a basis for the Court to

8   consider the preliminary injunction and grant it.

9            THE COURT:  I.e., what you're saying is, if I

10  dismiss the adversary proceeding you'd still have a separate

11  proceeding pending?

12           MR. GOLDMAN:  Absolutely, Your Honor, that's what

13  the counterclaim is there for.

14           THE COURT:  Well, what about the issue about

15  likelihood of success on the merits?

16           MR. GOLDMAN:  I believe that we have shown that we

17  would likely be able to prevail on the merits in the manner

18  that Judge Cote has described and as we have discussed at

19  length this morning.

20           THE COURT:  Because your argument is, I would have

21  not to get into whether there was a fraud or not because it's

22  simply a matter of contract interpretation.

23           MR. GOLDMAN:  Correct, Your Honor, as to the

24  advancement obligation.  Ultimately, there will be a

25  determination before Judge Cote --

72

1          THE COURT:  Right, as to the advancement issue.

2          MR. GOLDMAN:  Exactly.

3          MR. KLINE:  Your Honor, may I just be heard to

4    supplement one point, and I apologize.  Ivan Kline for Friedman

5    & Wittenstein.

6          Part of what's in our counterclaims is the fact

7    that even if Mr. Bennett's knowledge is shown we still have

8    coverage and we can adjudicate that and none of the issues

9    relevant to that will be before any other court because the

10   policy provisions or document relied upon by Axis is simply not

11   part of the policy.  The warranty is not part of the policy and

12   a prior knowledge exclusion is not in the policy.  Those have

13   nothing to do with Mr. Bennett's knowledge and will not be

14   adjudicated anywhere else, there will be no discovery in any

15   other case that relates to those issues.  That's what our

16   counterclaims are largely premised on.  Even if one assumes

17   knowledge or it's shown elsewhere, we still have coverage.

18   This Court, really, is the right court and as of now the only

19   court that can adjudicate our position on that and those are

20   what support our advancement request.

21          MS. GILBRIDE:  Your Honor, thank you for allowing

22   me to have the last word.  I hope it is the last word.  But,

23   frankly, what I'm hearing is that the insureds want to have

24   their cake and eat it too.  Your Honor has shown a disposition

25   to dismissing the action because you believe there's a

1  substantial overlap in the issues.  The counterclaims are based

2  on the very same disputed facts and disputed issues that are

3  asserted in our claim.

4          THE COURT:  See, let's explore that for a second.

5   They're saying that they're not because for them to win on the

6  -- they're saying for this advancement-of-cost issue all I have

7  to do is interpret the insurance policy as to what those

8  provisions that you and I went through mean as opposed to

9  finding that in fact they were triggered.  For you to win you

10  have to prevail on both issues.  You have to find that they

11  were triggered, too.  You have to convince the Court that they

12  were triggered.

13          MS. GILBRIDE:  Your Honor, in order for them to

14  prevail on their counterclaims they have to show that their

15  claims are covered claims.

16          THE COURT:  I know but that begs the question --

17  that has me assuming your interpretation of the contract is

18  right.

19          MS. GILBRIDE:  Well, Your Honor, you only get to

20  that interpretation -- I think in order to get to that issue

21  you need to determine whether or not the underlying claims --

22  it's the cart and the horse here.  I mean --

23          THE COURT:  But why is that?  Why would I need any

24  discovery as to what any of these defendants knew about the

25  alleged fraud if in fact the duty to advance defense costs is

74

1  something that has to wait for -- I'm sorry -- doesn't have to

2  -- your client's being relieved of the duty to advance defense

3  costs has to await a final determination on the merits that

4  it's a funding mechanism as opposed to an ultimate liability

5  mechanism?

6          MS. GILBRIDE:  But, Your Honor, our position is

7  that it is --

8          THE COURT:  Well, I know that's your position, but

9  in terms of deciding the issue it doesn't really implicate the

10 substantial overlap doctrine.  I'm not sure it does.

11         MS. GILBRIDE:  I believe it does, Your Honor, and

12 I believe it's fundamentally unfair --

13         THE COURT:  But why?

14         MS. GILBRIDE:  Because basically our position is

15 that the claims are not covered and you have to determine that

16 by looking at the underlying acts and finding whether or not

17 the warranty applies and whether or not the prior knowledge

18 exclusion applies.  I think that you can't do one without the

19 other, Your Honor.

20         THE COURT:  They could prevail without that; it's

21 just that only you have to win on both points.  They could win

22 on one.

23         MS. GILBRIDE:  But for them to win on one there

24 has to be an excision of a word from the insurance policy, the

25 word "covered" --

75

1          THE COURT:  Well, but again, that's the --

2          MS. GILBRIDE:  -- and I don't think Your Honor --

3   respectfully, I don't think Your Honor can make a determination

4   without getting into the facts on that regardless --

5          THE COURT:  But what facts?  I mean either it's

6   not ambiguous and it's based on the plain meaning of the

7   document or it's somewhat ambiguous but construed against the

8   insurer or the insurer is able to say, well, even if you

9   construe it against me it's still --

10          MS. GILBRIDE:  I think in order to grant a

11   preliminary injunction, Your Honor, you have to get the

12   substantial likelihood of success on the merits and I don't

13   think --

14          THE COURT:  But isn't -- again, I confess what --

15          MS. GILBRIDE:  Mr. Goldman.

16          THE COURT:  No.  No, that was --

17          MS. GILBRIDE:  Mr. Kline.  Mr. Eisen.

18          THE COURT:  No.  I'm going somewhere else.

19          MS. GILBRIDE:  Okay.

20          THE COURT:  When I read your argument about the

21   defendants taking inconsistent positions I kind of dismissed

22   that right away because it was in the context of the motion to

23   dismiss and, clearly, Mr. Walsh's clients weren't taking

24   inconsistent positions.  So I didn't even think about it,

25   whether they were inconsistent or not, but I'm not sure they

76

1    are inconsistent.  I mean Mr. Walsh's clients want your claim

2    dismissed, but even if you hadn't made that claim wouldn't any

3    beneficiary of this policy have a right to start a lawsuit

4    saying that you've wrongfully failed to pay?

5                MS. GILBRIDE:  Yes, of course --

6                THE COURT:  Now, I thought that wasn't truly ripe

7    -- when I came into this I thought that wasn't truly ripe -- in

8    the real term of ripeness, because other than saying you want

9    me to determine whether you don't have to pay you hadn't said

10    "we won't pay," but I thought I heard you say at the beginning

11    of this hearing --

12                MS. GILBRIDE:  We said --

13                THE COURT [to Ms. Kim]:  I'll do the talking.

14                MS. KIM:  Sorry.

15                THE COURT:  I thought I heard you say at the

16    beginning of this hearing, no matter whether you dismiss or not

17    "we won't pay," and that makes it ripe to me, I think.  I mean

18    if Axis is saying literally today, we're not going to go back

19    and rethink this and consider whether -- now that Judge Drain

20    is not going to decide for us whether we have to pay or not,

21    whether we're going to take the risk of not paying -- which,

22    you know, is certainly a legitimate thing for an insurer to do.

23     It's one thing to act unilaterally, it's another thing to ask

24    a court for a determination of whether they're acting properly.

25     At this point Axis would be acting unilaterally.  That raises

77

1   some fairly serious issues, you know, and maybe creates

2   potential liability beyond the coverage so -- but if you're

3   telling me today Axis has already made that decision, it's

4   going to act unilaterally and not withhold the money, then this

5   is ripe.

6           MS. GILBRIDE:  Your Honor, I can't make a

7   representation one way or the other about what Axis will do

8   because we didn't know what your ruling was going to be and so

9   --

10          THE COURT:  Well, no, but I thought you told me --

11  I mean I don't have a court reporter here, we're on electronic

12  transcript -- at the beginning of the hearing that --

13          MR. BORGEEST:  Your Honor, Wayne Borgeest on

14  behalf of Axis.  May I be heard briefly?

15          THE COURT:  On behalf of?

16          MR. BORGEEST:  Axis.

17          THE COURT:  Okay.

18          MR. BORGEEST:  If I may, Your Honor, Axis denied

19  coverage over a year ago so the company staked out its position

20  well over a year ago.  The position --

21          THE COURT:  Yes, but at that point it didn't

22  really matter.  I mean you could always change your mind --

23          MR. BORGEEST:  Well, no --

24          THE COURT:  No one was asking you for money then.

25          MR. BORGEEST:  Well, I think it did matter.  I

1    think that counsel was free to bring --

2              THE COURT:  Do you really want to say that?

3              MR. BORGEEST:  Counsel was free to challenge --

4              THE COURT:  I mean --

5              MR. BORGEEST:  Your Honor, Axis did not get so

6    much as a letter disputing the denial.

7              THE COURT:  But --

8              MR. BORGEEST:  I think what the counterclaim

9    defendants are saying is that for purposes of your jurisdiction

10   it's okay for them to prove that their clients were wrongly

11   treated but in denying us our prosecution of our complaint for

12   declaratory judgment of no coverage you're not allowing us to

13   prove that we are correct in our position and that obviously is

14   an absurd result.

15             THE COURT:  It's not, I don't think so.  I'm

16   sorry, I beg to differ because it's two different issues.

17             MR. BORGEEST:  No, but we filed an action for a

18   declaration of the Court --

19             THE COURT:  Right.

20             MR. BORGEEST:  -- that there's no coverage for

21   these individual insureds.

22             THE COURT:  I understand and --

23             MR. BORGEEST:  They have counterclaimed saying

24   that there is coverage for their insureds.

25             THE COURT:  No, they have not.  They have

79

1   counterclaims saying that your client has to advance defense

2   costs.

3           MR. BORGEEST:  That's correct.

4           THE COURT:  And they have a different

5   interpretation of the contract than your client has.

6           MR. BORGEEST:  But, Your Honor.

7           THE COURT:  They say that that provision is a

8   funding mechanism subject to recoupment or reimbursement.  You

9   say it's a coverage issue.

10          MR. BORGEEST:  With all due respect, Your Honor,

11  Your Honor cannot --

12          THE COURT:  With all due respect I read it and

13  that's what it says.

14          MR. BORGEEST:  But, Your Honor, with all due

15  respect the Court cannot find that there is a funding

16  obligation without finding that there is coverage.

17          THE COURT:  I disagree completely.

18          MR. BORGEEST:  Well, then we have a disagreement

19  but --

20          THE COURT:  I can't find that there is no funding

21  obligation without finding that the insurer has no underlying

22  liability, but in terms of the issues as to the meaning of the

23  contract and what the provisions mean, as far as coverage and

24  the reference to "finally determined," that has nothing to do

25  with the evidence that's going to be coming out in the

80

litigation in the District Court.

MR. BORGEEST:  But, Your Honor, how can the Court find that there's a funding obligation in the face of a claim which you now want us to take over to another courthouse where we are going to prosecute the claim to find that there is no coverage?

THE COURT:  Oh, no, this litigation would have to be limited to a fairly narrow set of issues.  It would not get into that issue.

MR. BORGEEST:  Your Honor, we're being put in a very awkward position.  We responded to the motion to dismiss by saying that we would litigate our coverage issues in a narrow fashion without burdening the underlying securities litigation.  Your Honor has given an indication that you're inclined to reject that --

THE COURT:  Because it wouldn't happen.

MR. BORGEEST:  -- because of the overlap.

THE COURT:  Right.

MR. BORGEEST:  If there's overlap for our claim for a declaration of no coverage there necessarily must be overlap with their declaration of some claim that funding in the absence of a determination of coverage.

THE COURT:  All right.  I thought you were going to stand up to say something completely different which is that this isn't ripe --

1          MR. BORGEEST:  I'm sorry, Your Honor.

2          THE COURT:  -- and the insurer has really not made

3    up its mind, but I think we're just repeating the same

4    argument.

5          So, is the insurer saying it's not going to pay or

6    not?

7          MR. BORGEEST:  Your Honor, the insurer issued a

8    denial letter well over a year ago that went unchallenged.

9          THE COURT:  I understand that, but there's -- I

10   also understand that there's a big difference, and potentially

11   a legal difference as far as the insurer's liability, when push

12   really comes to shove and the request is made, because they

13   need the money -- they've gone through the first layer of

14   excess -- that it really won't fund, because that's when the

15   damages start and that's when penalties start for the insurer.

16    So that's a very serious decision for an insurance company to

17   make.

18         MR. BORGEEST:  It is and that's the reason why we

19   filed a declaratory judgment action --

20         THE COURT:  I understand, and that's why I thought

21   the insurer was deciding to act not unilaterally but to try to

22   get a judicial determination, and I don't fault you for that.

23   That's a good thing.  That's what responsible parties do; but,

24   although I had not decided this until preparing for this

25   hearing, it's not going to work here.  I can't give you that

82

1  determination.  So now you have to decide whether you're going

2  to act unilaterally -- in which case I think this motion is

3  ripe -- or not, and I'm happy to give you a little time to

4  decide that.

5           MR. BORGEEST:  Your Honor, we're prepared to

6  litigate the issue of coverage.  That's why we're here.  The

7  contract itself by its terms --

8           THE COURT:  You lost on that point.

9           MR. BORGEEST:  Okay.  Let me turn to another point

10 then.

11          THE COURT:  Okay.

12          MR. BORGEEST:  The contract by its terms gives

13 Axis the unilateral right to determine how much of the defense

14 costs are covered and how much it will pay.  Contractually, it

15 gives Axis that right unilaterally.

16          THE COURT:  I am happy to determine those issues

17 here -- those contract interpretation issues if you're telling

18 me that if I don't determine them you're going to withhold

19 coverage.

20          MR. BORGEEST:  Your Honor, we came here, filed

21 this action prepared to litigate the contract issues.  All

22 we're saying is you can't litigate some and not all.

23          MS. GILBRIDE:  Your Honor, you're asking us to go

24 to another courthouse to litigate this.

25          THE COURT:  No, I'm asking you to tell me whether

83

1  in fact your client's going to pay or not.  If they're not,

2  then I think this is ripe.  If they are going to advance

3  defense costs or they're considering it, it's either not ripe

4  or I'll give your clients some more time to consider this

5  issue.

6          MS. GILBRIDE:  Our position has consistently been

7  that we're not going to advance defense costs in the absence of

8  a judicial determination that we must.  Our policy says that we

9  -- it says that we must advance covered defense costs.

10          THE COURT:  Okay.  Then I believe this issue is

11  ripe.  So I have been persuaded -- Mr. Goldman has persuaded me

12  that I should dismiss the underlying action brought by Axis but

13  keep the counterclaim on the docket.

14          It seems to me as a practical matter it may make

15  sense to move to withdraw the reference of this matter, but

16  that's not something I can do.  I also need to know -- because

17  there's no record here really -- as to when these costs are

18  going to kick in.

19          MR. GOLDMAN:  Your Honor, they've already kicked

20  in.  We have bills that were submitted to Axis approximately

21  two weeks ago for July-time because the Lexington policy

22  exhausted with the payment of June-time so they have the bills,

23  we're waiting for payment.

24          MR. KLINE:  I don't believe this is a dispute,

25  Your Honor.

84

1          MS. GILBRIDE:  That's correct.

2          THE COURT:  There are outstanding bills?  How

3    much?

4          MS. GILBRIDE:  Approximately $2 million has been

5    submitted to us in the past month.

6          THE COURT:  And when were they submitted?

7          MS. GILBRIDE:  Plus, there's been a settlement

8    demand tendered to the carrier.

9          THE COURT:  When were the bills submitted?

10          MS. GILBRIDE:  Over the course of the last several

11    weeks.

12          THE COURT:  Well, we're really just talking about

13    the defense costs here; right?  Because the settlement demand

14    is going to be subject to a fairness hearing, notice to the

15    Refco Trustee and the like.  That money is not going to come

16    out-of-pocket for quite some time.

17          MR. GOLDMAN:  That's correct, Your Honor.

18    Obviously, Judge Lynch would have to have an approval on that

19    in accordance with Rule 23.

20          THE COURT:  What is your response on the bond

21    point?

22          MR. GOLDMAN:  In brief, Your Honor, it turns the

23    policy upside down.  They're asking us to be their insurer.

24    The policy terms are express.  I don't think there's any

25    difficulty interpreting it as exactly as the Court has

85

1  identified it, a funding vehicle.  It would be the same as

2  every --

3          THE COURT:  Well, no, I was just identifying the

4  issue not -- I wasn't --

5          MR. GOLDMAN:  I understand.  I understand, Your

6  Honor.  It would be the same as asking every automobile

7  accident person to bond the costs until the insurer decides

8  whose liable.  It doesn't work that way.  That's what insurance

9  is for.  That's what the particularity of an insurance contract

10  is all about.  It's their obligation to assume that risk and

11  contractually we would assert we will convince this Court that

12  they assume precisely that risk with the language that they

13  drafted.

14          THE COURT:  Is the discovery -- has there been any

15  change in the intensity of the litigation in terms of the

16  incurrence of legal fees and the like?

17          MR. GOLDMAN:  I'm sorry, the securities

18  litigation, Your Honor?

19          THE COURT:  Yes.

20          MR. GOLDMAN:  Yes, discovery started.

21          THE COURT:  And there's no like hiatus or anything

22  like that, it's moving ahead?

23          MR. GOLDMAN:  No.  We're not in hiatus world, Your

24  Honor.  We're in an incurring debt world.

25          THE COURT:  And you say the criminal trial is now

86

1  on for March?

2         MR. EISEN:  Yes, Your Honor, and there has been, I

3  think -- because we were set initially for October -- there was

4  a very intense period which I think is some of what's in the

5  pipeline as a result of the continuance.  I know I was able to

6  take my summer vacation, so I think that there has been some

7  lessening there, although obviously we're going to need to get

8  ready for that as well.

9         THE COURT:  You've agreed upon the amount of the

10  legal bills that have been submitted?

11         MS. KIM:  Your Honor, the practice has been that

12  the parties simply submit the bills to the carrier and there

13  has not been any requirement of consent or --

14         THE COURT:  No, I'm not talking about consent,

15  just literally what the amount is of the bills.

16         MR. KLINE:  Your Honor, no one of us would have

17  any way to know the total because --

18         THE COURT:  No, I thought you might have conferred

19  among --

20         MR. KLINE:  No.  We only see our own.  Only Axis

21  would know the --

22         MS. KIM:  Yes.  All we do, Your Honor, is submit

23  the bills and we understand it's a first come/first serve basis

24  and then they let us know when it's exhausted.  That's exactly

25  what happened with the U.S. Specialty and the Lexington

87

1  policies.

2         THE COURT:  But you say it's about $2 million?

3         MS. GILBRIDE:  Yes, Your Honor.  I mean we've just

4  gotten the bills in, so they haven't been the subject of any

5  sort of a review for what's been incurred but that's the gross

6  amount.

7         MR. CASHMAN:  Your Honor, I'm sorry, I haven't

8  spoken yet.  This is Richard Cashman.  We represent one of the

9  officer defendants, Philip Silverman, and I just wanted to

10 respond to Your Honor's question, and that is there are bills

11 that are coming, as well, because there has been a lot of

12 activity in these cases.

13        MS. KIM:  What do you recommend [sic]?

14        THE COURT:  Well, it seems to me that on the issue

15 of the contract interpretation one could get to that issue very

16 quickly.  It's a matter of contract interpretation and

17 consequently unless someone has a different view I should not

18 be thinking here about a lengthy injunction and if it is to be

19 teed up here it should be teed up promptly.

20        I continue to think, although this is beyond my

21 power, that given the existence of a securities action and the

22 inevitable tie-ins to settlements that a district judge might

23 want to have the reference but that's not for me to decide.

24        I also know that law firms generally are prepared

25 to wait a little bit for payment of their bills.  So I'm really

1    focusing on the ones that have been billed and not on some sort

2    of general green light for anything coming due over the next

3    several weeks or months. But I am prepared to conclude on the

4    basis of my review of the general principles set forth in the

5    WorldCom case with regard to how courts look at provisions in

6    indemnity policies in respect of the advancement of defense

7    costs, as well as the particular language at issue here on Page

8    8 of the policy, that as far as the "merits" aspect of a motion

9    for a preliminary injunction is concerned there is either a

10   substantial likelihood of success on the merits or -- and I

11   strongly emphasize the "or," because this is more where I'm

12   focusing -- sufficient questions going to the merits which in

13   light of the balance of the harms here would mean that on the

14   issue of the merits the movants have sustained that prong of

15   their request for a preliminary injunction. Going to the

16   "harms," although it is asserted -- and I accept this -- that

17   certain of the defendants are wealthy individuals, the amount

18   of the defense costs here -- $2 million -- following upon the

19   primary carriers' coverage limits being exceeded tells me that

20   these are extremely substantial defense costs that need to be

21   incurred as part of this schedule that's been set out by the

22   various courts -- the criminal court in particular, but also

23   the district court in the securities litigation -- and that to

24   run the risk of not having counsel proceed or to substantially

25   cut back upon their efforts because of unpaid bills is a

1   tremendous potential harm, particularly in a criminal context

2   (and I note that as Judge Gerber has in the Adelphia case,

3   there is a significant distinction between an indictment and a

4   conviction and the criminal trial is at the trial stage, not

5   the appellate stage).

6          That leaves, I believe, the issue initially raised

7   by counsel for Axis, and pressed by counsel for Axis, that a

8   ruling granting the request for a preliminary injunction is

9   fundamentally inconsistent with a ruling dismissing Axis'

10  underlying case, which obviously I just issued.  I do not

11  believe that it is inconsistent with that ruling or unfair to

12  Axis.  As I noted before, for Axis to prevail in its

13  declaratory judgment action it needs to prove two things: one,

14  it needs to prove that its interpretation of the contract --

15  the insurance policy -- as well as potentially the related

16  warranty, is the right interpretation, the correct

17  interpretation.  That is not a matter that substantially

18  overlaps with litigation anywhere else.  In particular, it

19  doesn't substantially overlap with litigation in the District

20  Court in the securities law action or with litigation in the

21  criminal action.  However, if Axis' interpretation of the

22  contracts as they apply to the duty to advance defense costs is

23  incorrect, then the plaintiffs on the cross-claim or the

24  counterclaim prevail as far as the defense costs advancement

25  issue is concerned.  Therefore, it seems to me that those

1    issues -- those contract interpretation issues -- are discrete

2    and can be decided by me.  As I noted, Axis needs to win two

3    things in order to not advance defense costs, however. In

4    addition to having its interpretation of the contract prevail,

5    it also has to convince a Court that the exclusions or its

6    right to rescind or its right under the warranty, so-called,

7    have been triggered, and that is what overlaps as I have

8    previously found, with the District Court litigation in the

9    criminal case. But it seems to me the plaintiffs' claim here --

10   and the only plaintiffs that would be left would be the

11   counterclaim plaintiffs -- is not subject to that problem and

12   can go forward.  As you can tell from my earlier remarks, I

13   toyed with the idea of somehow putting this off or delaying it

14   so that the whole matter could be joined with the District

15   Court litigation, because I think that in terms of settlement

16   and the like that may make sense, but that's not something I

17   can do, and I do have an obligation to exercise my jurisdiction

18   unless it's withdrawn from me, except where the law requires me

19   not to as in the "substantial overlap" case law. And so, there

20   having been a counterclaim filed which can survive as the only

21   claim in this adversary proceeding, I have jurisdiction to

22   determine the motion for a preliminary injunction.  I don't

23   believe that it is unfair to exercise that jurisdiction here or

24   inequitable, and, therefore, the equitable relief sought can

25   and should be granted.

1           There has been a request for a bond to be posted,

2    but as Mr. Goldman said and as I believe the case law provides,

3    that would be tantamount to advancing one's own defense costs

4    and contrary to the case law.

5           So let me be clear: as I said before, it seems to

6    me that the injunctive relief that I'm ordering here should be

7    limited to bills that are outstanding; and I believe this is

8    the case, but I want to be clear -- I am doing nothing more

9    than saying that.  The insurer, Axis, is directed to advance

10   defense costs based upon the beneficiaries' definition of or

11   interpretation of the provisions on Page 8 requiring

12   advancement, i.e., if there are other provisions, or to the

13   extent there are other provisions, of the insurance policy that

14   apply to the advancement of defense costs other than the issue

15   that's been teed up here -- i.e., whether there needs to be a

16   final determination or not -- I'm not overwriting those

17   provisions.  This just goes to the dispute as to whether there

18   needs to be a final determination of coverage or not related to

19   the advancement of defense costs.  So, for example, if Axis has

20   the ability to review for reasonableness or the like under the

21   insurance policy, that's not being overridden by this ruling.

22   The only thing that Axis is being directed to do is to comply

23   with the provision that requires defense costs to be advanced,

24   subject to the final determination, and we should schedule the

25   final hearing on this promptly, which I view to be a matter

92

1   that can be decided based on review of the contract unless

2   someone else tells me otherwise.

3           The parties have obviously done a lot of briefing

4   on the merits already of that issue.

5           MR. GOLDMAN:  Yes, Your Honor.

6           THE COURT:  So if we did this --

7           MR. GOLDMAN:  Your Honor, just one moment.

8                   [Pause in proceedings.]

9           MR. GOLDMAN:  Your Honor, having conferred with

10  the small group of co-counsel we have here I think our

11  assessment is certainly if Axis wishes to file in a further

12  brief on the contract interpretation issue which we have always

13  felt is the narrow issue we have been presenting we would then

14  file a responsive brief and we would schedule with the Court's

15  cooperation as early as the latter part of September for a

16  further hearing on this.

17          THE COURT:  It would be on a motion for a summary

18  judgment though; right?

19          MR. GOLDMAN:  Yes, Your Honor, we could file a

20  motion for summary judgment.

21          THE COURT:  Or, I guess, a motion to dismiss.  It

22  could be either one.  It would really be a motion -- well --

23          MR. GOLDMAN:  We'll do a motion for partial

24  summary judgment.  That's what we're going to do.

25          [Other attorneys commenting in the background]

93

1          MR. GOLDMAN:  That's what we're going to do,

2    narrowed to the issues that the Court has identified we are

3    focused upon.

4          MS. GILBRIDE:  Your Honor, respectfully, on behalf

5    of Axis we intend to file an immediate appeal of Your Honor's

6    ruling today.

7          THE COURT:  Okay.

8          MS. GILBRIDE:  So we would ask that that be

9    factored into whatever briefing schedule is going to be

10   established.  We understand we have to do that within the next

11   ten days and we would ask that the order ordering us to advance

12   defense costs be deferred until we can get an appeal filed with

13   the District Court.

14         MR. GOLDMAN:  I understood that to be a request

15   for a stay?

16         THE COURT:  As long as it's an expedited appeal.

17         MS. GILBRIDE:  Oh, we intend to file it, you know,

18   as quickly as we can.

19         THE COURT:  No, no, that you request expedited

20   treatment --

21         MS. GILBRIDE:  Yes, we will.  We will, Your Honor.

22         THE COURT:  All right.  I mean I could actually --

23   I have a lot going on at the end of September and beginning of

24   October in various cases but I could give you October 12th just

25   for your own purposes and you could tell the District Court

94

1    that.

2          October 12th.  Friday.

3          MR. GOLDMAN:  Is that after the NCBJ?  I believe

4    it is actually or is it during?

5          THE COURT:  I don't know.

6          MR. GOLDMAN:  It doesn't --

7          THE COURT:  If it is -- I wasn't going to be going

8    to that.

9          MR. GOLDMAN:  I gathered.

10         THE COURT:  But I could give you that date.

11         MR. GOLDMAN:  One moment if I may, Your Honor.

12         THE COURT:  But I am inclined to grant this

13   request.  It seems to me while it's important to deal with the

14   billing issue -- for a lot of reasons I'm inclined to grant

15   this request.

16         MR. GOLDMAN:  And Your Honor let me make one

17   comment and then my co-counsel will speak if I may.  We have so

18   much expense coming up. The fear is that this not be

19   characterized as a stay that the appellate court presumes can

20   be continued --

21         THE COURT:  No, I don't -- that's why I asked for

22   --

23         MR. GOLDMAN:  -- I don't know that ten days

24   doesn't matter but six weeks does.

25         THE COURT:  That's why I requested an expedited --

1    that we'd be conditioning it upon an expedited appeal.

2                MR. KLINE:  Your Honor, can I suggest it might be

3    more appropriate -- we don't mind if they're given ten days to

4    pay but it should be incumbent upon them to get a stay from the

5    District Court.

6                THE COURT:  But you can do that in ten days.

7    That's easy to do.

8                MR. KLINE:  Right.  But absent a stay from the

9    District Court they should be required to follow Your Honor's

10   order and pay; otherwise they'll just file and say we don't

11   have to pay.

12               THE COURT:  My view is this issue could be well

13   teed up for the District Court within ten days, and I think

14   that's what counsel intended.

15               MR. KLINE:  I think with all respect it should --

16               THE COURT:  So I will -- it's stayed for ten days

17   but that's more than sufficient time to put in an appeal.

18               MR. GOLDMAN:  I understand.

19               THE COURT:  I know lawyers can wait ten days on

20   payment of their bills but I'm also, as I said, very cognizant

21   of the fact that the bills are very large and they're going to

22   be increasing in the future and that this issue on the merits

23   really needs to be decided very quickly -- this contract

24   interpretation issue -- and so I'm telling you all that I would

25   be free on October 12th to hear it, and I think that may be

96

1   useful for the District Court also, but I'm not going to impose

2   a briefing schedule on you because the next step of this is

3   going to be at the District Court; but as everyone now

4   understands that step has to result in some action by the

5   District Court within the next ten days or my stay is going to

6   be gone -- the stay that applies now is going to be gone.

7              MR. GOLDMAN:  That's fine.

8              Your Honor, we will be bringing on a summary

9   judgment motion probably before the District Court -- partial

10  summary judgment -- but that --

11             THE COURT:  All right.  But I think the October

12  date gives people -- particularly given all the work that they

13  have done on it and, I'm sure, will be doing on it, people will

14  be reciting these provisions of the insurance agreement in

15  their sleep and will be well enough prepared for a hearing in

16  October.

17             MR. GOLDMAN:  That already has happened.

18             THE COURT:  Okay.  That leaves the stay motion.

19             MR. GOLDMAN:  The stay motion and I --

20             THE COURT:  All right.  But before we go to that

21  you'll need to give me an order --

22             MR. GOLDMAN:  Yes.

23             THE COURT:  -- and you should do it promptly

24  because that's what's going to start their appeal, obviously,

25  and that needs to go forward promptly so --

97

1          MS. GILBRIDE:  There would be two orders, Your

2     Honor, right?

3          THE COURT:  Well, Mr. Walsh is going to give me an

4     order dismissing the main -- the adversary claim brought by

5     Axis, and Baker & Hostetler is going to give me an order

6     granting the preliminary injunction in connection with their

7     cross-claim, or counterclaim, excuse me.

8          MS. GILBRIDE:  Your Honor, if I heard you

9     correctly the ten days would then start to run from the date

10    that you sign that order?

11         THE COURT:  Well, from the entry of the order.

12         MS. GILBRIDE:  Right.

13         THE COURT:  No, no, I'm sorry, the ten days on the

14    --

15         MS. GILBRIDE:  To get an expedited --

16         THE COURT:  For the injunction?  Yes.

17         MS. GILBRIDE:  Yes.

18         THE COURT:  Yes.

19         MR. GOLDMAN:  All right, Your Honor, just because

20    we have discussed the stay issue at some length I have nothing

21    further to add.  I only wanted to make one -- I'll call it the

22    tangential point -- one of the reasons why we have sought the

23    stay modification to the extent it was necessary in light of

24    the plan confirmation order was precisely because demands to

25    the insurers need to be made under cooperation provisions in

98

1  many of these policies for them to put it in line for payment.

2   Obviously, they make their determinations in response but I

3  certainly did -- that was a primary reason why we wanted to get

4  this clarification and, of course, it's my understanding that

5  nothing in today's ruling with respect to the preliminary

6  injunction motion changes the fact that we would submit a

7  demand to the insurer.  It doesn't mean they're going to pay

8  it, obviously, but it does mean we have the right to do that.

9  That's in large part what the lift stay motion is all about.

10 We have, as I have said, agreed we will provide notice to Mr.

11 Kirschner regarding our doing so.

12          THE COURT:  Okay.

13          MR. KLINE:  Your Honor, Ivan Kline from Friedman &

14 Wittenstein.

15          It's been a long morning and I'll be very brief.

16 Our only point of our response is really we believe it would be

17 more appropriate to make sure that a particular settlement is

18 back before this Court for approval given that this is the

19 Court that has jurisdiction over the policy and has all the

20 insureds before it and no other court has that; whether it's in

21 the context of the stay or not to stay or using your authority

22 under Section 105 is really less important than we simply

23 believe that there should be some mechanism whereby a

24 particular settlement would be subject to this Court's review

25 and approval to make sure that all of the parties' rights

99

1  including those of the estate and those of other insureds are

2  not being prejudiced in any way, and I believe actually in the

3  letter from Axis that was submitted on their reply even

4  suggests that whatever the proposed settlement is would be one,

5  for example, that might prejudice the rights of other insureds.

6   I still don't know what the details are, so it's hard for us

7  to comment on that, but our point was simply we have no problem

8  with the concept of the stay being lifted to allow for the

9  payment of settlements; it's simply that we think it should be

10  in one form or another, a particular settlement should be

11  before this Court.

12          THE COURT:  Okay.  Well, again, I quoted the

13  language in Paragraph 34(c) of the confirmation order which I

14  believe enables the beneficiaries of the policies -- not just

15  the debtor but the other beneficiaries -- to seek and obtain

16  coverage and payments from those policies.

17          Now, it may be that the consequences of doing that

18  will affect the debtor in a way that would require some relief

19  here in terms of either a settlement or 9019 or the other

20  provisions of the plan but it's hard for me to conceive what

21  those would be and it seems to me that as long as there is

22  advance notice, not retroactive notice, but advance notice, of

23  any proposed settlement, that the plan administrator on behalf

24  of the estate will be able to protect the estate's rights and

25  that's, I gather, what Mr. Kirschner has concluded also.

1          It seems to me that the other beneficiaries, to

2     the extent the settlement involves insurance or -- well, I'll

3     leave it at that.  I mean obviously there are contribution

4     issues, too, but to the extent a settlement involves insurance

5     it should get notice of a settlement as far as approval by a

6     District Court is concerned in the MDL, for example.  So I

7     think as long as there is proper notice to other affected

8     parties that your concerns are taken into account.

9          MR. KLINE:  Your Honor, could I just ask then that

10    the order that they submit recite that there must be advance

11    notice, because I believe that the order they submitted calls

12    for post-disbursement notice --

13          THE COURT:  You're right.

14          MR. KLINE:  -- which is of no use for the

15    settlement

16          THE COURT:  It needs to be adequate advance

17    notice.

18          MR. KLINE:  And could the other insureds be

19    included in that so that if we wanted to seek relief in this

20    Court we could do so?  Frankly, I don't think Judge Lynch will

21    have any interest in hearing the claim of one insured against

22    another.  I think Judge Lynch's only concern in a Rule 23

23    approval is fairness to the plaintiffs in the class which is a

24    different issue.

25          So if we could just get that the notices to the

1  plan administrator and the other insureds in advance I think we

2  would withdraw any objection to their motion.

3        MS. KIM:  Well, Your Honor, I'd like to know "in

4  advance" of what? -- because all that we are seeking here is to

5  make sure that the automatic stay is not used as some kind of

6  procedural bar that interferes with the normal course under the

7  insurance policy for the carrier to determine whether or not a

8  settlement is reasonable, or not.  Obviously, any settlement

9  would be subject to the consent of the carrier and so what I

10  don't want to happen is to be required to give notice before

11  seeking consent or obtaining consent from the carrier -- after

12  the carrier.

13        THE COURT:  You're talking about getting advance

14  notice of approval by the court presiding over the litigation?

15   Is that what you're talking about?

16        MS. KIM:  Oh, that's fine.  We don't have any

17  problem getting advance notice.  Of course, we'd be required to

18  give notice to the parties to the underlying litigation.  They

19  would get notice just like any other party in terms of

20  obtaining approval before Judge Lynch on any settlement so I

21  just want it to be clear on the record what they're seeking.

22        THE COURT:  Well, I was asking you.  Is that what

23  you had in mind?

24        MR. KLINE:  All I'm asking is whatever advance

25  notice they promised Mr. Kirschner that we get.  I don't know

1  what they meant by advance notice to Mr. Kirschner but it must

2  be before disbursements.

3          THE COURT:  All right.  So you're --

4          MR. GOLDMAN:  We have no problem with that, Your

5  Honor.  Obviously we will circulate to him and to others an

6  order.  We have to have Mr. Kirschner look at it as well but

7  that order won't come in today. It will probably come in

8  tomorrow.

9          THE COURT:  Okay.  That's fine.

10         MR. GOLDMAN:  Your Honor, if I may we had

11 submitted to the Court a proposed order and as I review it in

12 respect of the preliminary injunction I think it is consistent

13 with the Court's ruling except that I would suggest that we

14 insert -- as it say there, "obligated to pay defense costs," I

15 would insert "ten days after entry of this order."

16         MS. GILBRIDE:  Your Honor, you know, I don't have

17 that order in front of me at the moment but I believe that's an

18 order ordering us to advance defense costs on behalf of all

19 insureds, not just the remaining insureds, No. 1, and I think

20 there's a reference to future costs in the order as well?  I'd

21 like the opportunity to review it before.

22         MR. GOLDMAN:  I think what we'll do is give her a

23 copy of what I have in my hands, Your Honor, if that's all

24 right.

25         THE COURT:  Well, let me take a look at it first.

1    Let me just take a quick look at it.

2                    [Pause in proceedings.]

3             THE COURT:  Well, this applies to the defined term

4    "movants" not all the parties.

5             MR. GOLDMAN:  Your Honor, just on -- we have no

6    objection to it applying to other insureds, just so the Court

7    understands that.

8             MR. EISEN:  Your Honor, if I may, we joined -- the

9    other defendants joined in so if the Court is inclined -- and

10   obviously our situation was part of the Court's reasoning.  If

11   the Court is inclined after this order we'd just ask --

12            THE COURT:  No, your clients did join in.

13            MS. GILBRIDE:  Your Honor, there are no

14   counterclaims asserted on behalf of his clients.  There's no --

15   they have not answered, they have not asserted counterclaims,

16   there is no basis for the Court to order advancement of defense

17   costs on behalf of his clients.

18            MR. WALSH:  Nonetheless, Your Honor, there is an

19   advancement obligation and it seems completely illogical to

20   make a determination for one and not the other.

21            THE COURT:  That's true, but it's also -- it's

22   procedurally -- you can make a motion promptly but there's no -

23   -

24            MS. GILBRIDE:  They made a motion to dismiss.

25            THE COURT:  No, no, they made a motion to dismiss

104

1    your client's claims but the only motion for a preliminary

2    injunction before me and the only counterclaim before me is --

3              MR. WALSH:  We understand that, Your Honor, so if

4    that's what Axis requires that we go through all the procedural

5    --

6              THE COURT:  Well, it's what I require.

7              MR. WALSH:  Okay.  Then we'll do that.

8              THE COURT:  And the same for the criminal

9    defendants.

10             MR. EISEN:  Your Honor, our joinder in the

11   existing motion --

12             THE COURT:  That's not sufficient.

13             MR. EISEN:  Just to be clear, so what does Your

14   Honor require?  That additional counterclaims --

15             THE COURT:  On an adversary proceeding basis,

16   which is what the counterclaim was, you need to start an action

17   for advancement of defense costs and seek preliminary

18   injunctive relief.

19             MR. EISEN:  Your Honor, is it sufficient to -- you

20   know, the posture that we were in up to this point was we had

21   joined in the motion to dismiss so there was no pleading

22   requirement for us before today.  Pleading is held in -- it was

23   the motion to dismiss the insurers' claims and we did join in

24   the motion for preliminary injunction so --

25             THE COURT:  But, procedurally, I'm not comfortable

105

1   with that.

2              MR. EISEN:  Just so I understand the parameters of

3   that, if that is filed around the representation that's going

4   to be filed may we be included or can we within that ten day

5   period of the order are we going to need to submit --

6              THE COURT:  No.  I think you're going to need to

7   go through the procedural hoops.

8              MR. EISEN:  Will that require an additional

9   hearing or can we just submit those -- I only ask that question

10  --

11             THE COURT:  I don't know.  I'll have to decide

12  that.  I don't know.  I would find it unlikely, but let me read

13  the pleadings.

14             MR. EISEN:  Thank you, Your Honor.

15             THE COURT:  Okay.  They're all different.  Your

16  clients, although I doubt it, might be multi-millionaires or

17  multi-multi-millionaires.  I don't know.  I know one of Mr.

18  Walsh's clients is.

19             MR. WALSH:  Was that taking inflation into

20  account, Your Honor?

21             THE COURT:  No.  No, they're not.  They're not.

22  They're not withdrawing it.

23             MS. GILBRIDE:  So you could dismiss the action.

24  They're not even parties.

25             THE COURT:  No, I said they can start their own

106

1  action and as part of that adversary proceeding seek injunctive

2  relief.

3          MS. GILBRIDE:  It's slightly inconsistent.

4          THE COURT:  Well, I've already ruled on that.

5          MR. EISEN:  Your Honor, at the risk of delaying

6  things may I quickly suggest another alternative that I think

7  would be easier for the Court which is to allow us the option

8  of intervention as opposed to filing independent adversary

9  proceedings?

10          THE COURT:  I'm not aware of such an option.

11          MR. EISEN:  Okay.

12          THE COURT:  I'm just not.  So somehow you need to

13  tee it up so that it's before me as far as an affirmative

14  claim.

15          MR. EISEN:  Understood and if we're able to puzzle

16  out another basis that we believe --

17          THE COURT:  I'm not precluding you from puzzling

18  out another basis.

19          MR. EISEN:  Thank you, Your Honor.

20          THE COURT:  Okay.  So by movants here -- the

21  defined term "movants" is just your clients; right?

22          MR. GOLDMAN:  The five that are named in the

23  motion.

24          THE COURT:  Right.  It's not those who joined in

25  the motion or anything like that?

107

1            MR. GOLDMAN:  That's correct.  That is the

2    definition.

3            THE COURT:  All right.

4                  [Pause in proceedings.]

5            THE COURT:  Defense costs -- as I recall the

6    motion it's interpreted open-endedly; right?  It's going

7    forward as well?  And my ruling just covered defense costs

8    incurred today?

9            MR. GOLDMAN:  Yes, Your Honor.

10           THE COURT:  Okay.

11           MR. GOLDMAN:  The motion defines it as the

12   contract defines it, Your Honor.

13           MS. GILBRIDE:  Your Honor, not to interrupt but

14   does it make sense to include your order on the dismissal

15   motion in this order as well so that for purposes of an appeal

16   that there's one order?

17           THE COURT:  No.

18           MS. GILBRIDE:  Okay.

19           THE COURT:  Okay.  Let me tell you what I've

20   written here because I believe this is the nature of my ruling

21   -- and it's Paragraph 3 -- "Effective ten days after entry of

22   this order Axis is directed upon the exhaustion of the

23   Lexington policy to pay defense costs of movants in the

24   underlying actions billed through the date of this order until

25   such time"  -- I'm sorry -- "pending a final determination by

108

1    this Court of Axis' claimed right to withhold such defense cost
2    payments until there's a final determination of its denial of
3    coverage under the Axis policies."  Because I'm not going to be
4    making a determination generally of coverage as this order had
5    provided.

6              MR. GOLDMAN:  So as I understand it and I believe
7    this is what the Court had discussed, we would have a right to
8    ask the Court to consider further defense costs presumptively
9    on or about October 12th?

10             THE COURT:  Yes, because this is just a
11   preliminary injunction.  We're going to have the final hearing
12   -- I can't have the final hearing on October 12th.

13             MR. GOLDMAN:  Yes.  I do not have a problem with
14   that language, Your Honor.

15             THE COURT:  All right.  So just to be clear, and I
16   think this is important for the record, too, I will not be
17   determining all of the issues as to whether your clients are
18   covered for defense costs.  What I am determining is whether
19   Axis is required to advance those monies now --

20             MR. GOLDMAN:  We understand that, Your Honor.

21             THE COURT:  -- as opposed to their argument which
22   is that because of the language on Page 8 that they could say
23   these aren't "covered" and, therefore, they don't have to be
24   advanced.

25             MR. GOLDMAN:  We understand that that is the

1  dispute the Court is considering.

2           MR. EISEN:  Your Honor, with the Court's leave, I

3  will be brief.  Our bills are also before Axis.  As the Court

4  knows, we joined in the motion.  We do not -- I've conferred

5  with my colleagues -- all of the indicted defendants -- the

6  presumptively innocent defendants as Your Honor noted -- are in

7  the most -- according to the Court's reasoning in the most --

8           THE COURT:  I can't do it.  I can't do it on the

9  procedural posture that we're in.  I understand logically your

10  clients' position, but they have not a procedural setting, I

11  believe, to seek a preliminary injunction.  They haven't

12  started an adversary proceeding, they haven't made a

13  counterclaim.  They are defendants in an adversary proceeding

14  that I've dismissed, and they have no counterclaim that

15  survived, because they didn't make a counterclaim.

16           MR. EISEN:  Your Honor, I understand.  I believe

17  it would not be improvident, though, for the Court to issue an

18  order that construes -- because it's the same policy at least

19  as to the --

20           THE COURT:  But orders don't do that.  I'm sorry,

21  I can't do that.  I won't do that.  You've heard my ruling.

22  There are aspects of a request for a preliminary injunction

23  that may not apply, conceivably, to your clients or to other

24  defendants, but on the fundamental issues you've heard my

25  ruling as to likelihood of success on the merits or the balance

110

1    of harms and substantial questions going to the merits and

2    that's as far as you could tell your clients that they could

3    have any sort of comfort at this point.

4                 MR. EISEN:  Your Honor, whatever the balance of

5    harms may be as to others the assets have been frozen for the

6    defendants.

7                 THE COURT:  Well, I understand, but sometimes, I

8    think -- not sometimes, always, unless the other side is

9    willing to waive it, and they're not waiving it and I

10   understand why -- you have to go through the procedural hoops.

11                MR. EISEN:  Thank you, Your Honor.

12                THE COURT:  Okay.  I've looked at the rest of the

13   order except for a numbering problem and my inserting after

14   "seeking reimposition of the automatic stay" in the next to the

15   last paragraph "to the extent it applies," I don't have any

16   other changes in it.

17                MR. GOLDMAN:  Thank you, Your Honor.

18                THE COURT:  Do you have a disc?

19                MR. GOLDMAN:  Not with us, Your Honor.

20                THE COURT:  Okay.  All right.  Well, then what I'd

21   ask you to do is to e-mail what you handed me, to chambers and

22   I'll mark it up as I read out.

23                MR. GOLDMAN:  Okay.  We will arrange that this

24   afternoon.

25                THE COURT:  Okay.

111

1          MR. GOLDMAN:  Thank you very much.

2          MS. GILBRIDE:  Your Honor, will we get the

3     dismissal order this afternoon as well?

4          THE COURT:  I don't know.  Are you going to submit

5     it to me?

6          MR. WALSH:  We'll try, Your Honor.

7          THE COURT:  Okay.  If not, it will be tomorrow.

8     It will get out very promptly.

9          MS. GILBRIDE:  Okay.  Thank you.

10         MR. EISEN:  Your Honor, one very quick -- it's not

11     on that motion.  Not at all.

12         THE COURT:  A different point?  Okay.  Good.

13         MR. EISEN:  We had a stay motion before the Court.

14      I believe the need for the stay motion has been obviated by

15     the overlap.

16         THE COURT:  It's moot.  It's moot.

17         You're right I should have addressed that but I

18     believe it's moot.

19         MR. EISEN:  Thank you, Your Honor.

20         THE COURT:  And in fact you could insert that in

21     the dismissal motion if you want or submit your separate order

22     on that if you wish.  You could talk to Mr. Walsh about that.

23                      *  *  *  *  *

24

25

112

* * * * *

1

2         I certify that the foregoing is a court transcript from

3    an electronic sound recording of the proceedings in the above-

4    entitled matter, except where, as indicated, the Court has

5    modified the transcript.

6

7

8

9                                         Ruth Ann Hager

10   Dated:  August 31, 2007

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25